22 A.3d 941

**Anthony LaFonte GREEN**

v.

**STATE of Maryland.**

**No. 383, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

June 30, 2011.

Allison P. Brasseaux (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for Appellee.

Panel: KEHOE, HOTTEN and JAMES P. SALMON (Retired Specially Assigned), JJ.

SALMON, J.

Anthony Green was indicted in the Circuit Court for Prince George's County, Maryland, and charged with attempted murder and various other offenses including first and second-degree assault, second and third-degree sexual offenses, reckless endangerment, use of a handgun in commission of a crime of violence, third-degree burglary, trespass, possession of a controlled dangerous substance, and sodomy. At the conclusion of Green's jury trial, the State *nolle prossed* the charge of possession of a controlled dangerous substance and the court granted a motion for judgment of acquittal as to the charge of sodomy, third-degree burglary, trespass, and one count of second-degree assault. The jury found Green guilty of third-degree sexual offense, fourth-degree sexual offense, second degree assault and reckless endangerment. The court sentenced appellant to ten years incarceration for third-degree sexual offense, a concurrent sentence of ten years for second-degree assault, and a consecutive sentence of five years for reckless endangerment. For sentencing purposes, the fourth-degree sexual offense was merged with the third-degree sexual offense.

Green contends in this appeal that his right to confront witnesses against him, guaranteed by the Sixth Amendment to the United States Constitution, was violated when the trial judge allowed the State to introduce into evidence a redacted copy of a report that was prepared by a nurse employed by the Sexual Assault Center at Prince George's Hospital, even though the preparer of the report was not available to be

cross-examined.[1] In support of his position, Green relies on *Crawford v. Washington*, 541 U.S. 36, 43–44, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and its progeny.[2] Because the issue presented is narrow, and because the State does not argue that any error in admitting the report was harmless, our summary of the evidence set forth in part I *infra* will be limited to facts that: 1) are directly relevant to the issue presented or 2) put the relevant facts in context.

## I.

## The State's Evidence

### A. Testimony of Ms. G.

Prior to January 6, 2008, Ms. G., age 17, and appellant were acquaintances, but Ms. G. did not know appellant's real name. She knew him by his nickname, "Ant." On January 6, 2008, appellant called Ms. G. at around 5:00 p.m. and the two agreed to meet. After they met, appellant suggested that they could "chill" at a friend's house. When they arrived at what suppos-

---

1. At the time of trial the nurse was on vacation.

2. The two most recent *"Crawford"* cases decided by the Supreme Court are *Michigan v. Bryant*, 562 U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), and *Bullcoming v. New Mexico*, —— U.S. ——, ——, 131 S.Ct. 2705, 2715, —— L.Ed.2d. —— (2011). In *Bryant* the court held that the statement to the police of the victim of a shooting (who died prior to trial) were not testimonial because the circumstances surrounding the encounter between the police and the victim objectively indicated "that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." *Id.* at ——, 131 S.Ct. at 1147, 179 L.Ed.2d at 99 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

In *Bullcoming*, the question presented was "whether the confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2710, —— L.Ed.2d at ——. The court answered that question in the negative.

edly was the friend's house, appellant entered the house through a side window, and then let Ms. G. inside.[3]

Ms. G. followed appellant upstairs to a bedroom where appellant rolled a marijuana cigarette, smoked some, and then offered it to Ms. G. who smoked "a little bit," and then put it aside. Appellant next told Ms. G., "I'm trying to get some, you know." Ms. G. interpreted those words to mean that he wanted to have sex with her. She replied: "no, I don't want to do nothing with you."

Appellant offered Ms. G. $200 to have sex with him, but she declined the offer. Appellant then said: "since you don't want to let me get some, can I at least suck your titties." When she refused, appellant became angry, pulled out a gun, and announced: "we're still going to have sex whether you like it or not." Ms. G. became upset and started crying, but appellant told her to "shut up and take [her] clothes off." Ms. G. complied. Appellant put the gun away but then took out a knife. He held the knife close to her face and told Ms. G. to "suck my dick. . . ." She performed oral sex on appellant while the latter was wearing a condom.

Appellant next told Ms. G. to turn around. Ms. G. once again complied and, while on her hands and knees, felt a knife on her "butt," although she did not see the knife at that point. To Ms. G., the knife felt like it was "[o]n my hole."

Ms. G. then "just went crazy" and started fighting appellant. She grabbed the knife and tried to pull it away, but the knife broke during the struggle. Ms. G. sustained cuts to her hand while trying to pull the knife away from appellant.

Ms. G. ran to a window in order to escape. As appellant tried to pull her back from the window, Ms. G. began yelling for help, both in English and Spanish. Appellant then stabbed Ms. G. in the stomach.

---

3. According to another witness, Flavia Favali, the home in question was located at 3802 Oliver Street, in Hyattsville, Maryland. In January 2008, the home, a rental property, was unoccupied and was undergoing renovations. Appellant did not have permission to be in that home.

Appellant next pushed Ms. G. through the mesh screen of the window. As he held Ms. G. by her legs, Ms. G. continued screaming for help. Appellant then dropped Ms. G. out the window and she landed on a roof, clad only in her bra. A passerby, later identified as Walter Martinez, gave Ms. G. a sweater and called the police.

Ms. G. told Martinez that appellant was "trying to rape me." [4] An ambulance arrived and took Ms. G. to the Washington Hospital Center. There, hospital personnel took pictures of Ms. G.'s injuries and put band-aids on her stomach and legs. She was next taken to the Sexual Assault Center located at the Prince George's Hospital Center.

On cross-examination, Ms. G. admitted that she originally told police that appellant inserted his penis into her vagina even though he had not done so. She also initially told the police that appellant offered her $2,000 in exchange for sex, which was $1,800 more than the actual offer. She further admitted that she told a nurse that appellant did not point a gun at her.

## B. Testimony of Officer Danielle Gray

Officer Danielle Gray, of the Hyattsville Police Department, responded to the house in which Ms. G. said she was attacked. Once there, she found Ms. G. "crying hysterically," with "blood all down her legs." The officer observed that Ms. G. was not wearing pants or underwear, and was only wearing a bra and the garment that Ms. G. had borrowed from Martinez. Officer Gray also observed cut marks on Ms. G.'s legs, and a stab wound to her stomach. In Officer Gray's words, the victim "was bleeding really bad."

Officer Gray accompanied Ms. G. when the latter was taken by ambulance to the hospital. During the ambulance ride, Ms. G. told Officer Gray that appellant "pushed her on the bed and he entered her vagina with his penis and then they started

---

4. Martinez's trial testimony confirmed that Ms. G. told him that a man was trying to rape her.

fighting." Ms. G. also told Officer Gray that appellant cut her on the legs with a knife, and that the cut wound on her stomach was the result of appellant having "stabbed her with the knife."

## C. Washington Hospital Center Records

With the exception of a few minor redactions, Ms. G.'s entire medical records from the Washington Hospital Center ("WHC") were admitted. These records show that the patient was admitted to the WHC at 8:26 p.m. on January 6, 2008 and discharged about two hours later. Upon entering the hospital the patient gave a history of having been the victim of an assault. Her major complaint was a "stab wound" to the abdomen and "rape." A CT scan of the pelvis with contrast was performed along with a focused sonogram of the stomach area. The results were normal except for a "[s]uperficial stab wound" of the abdomen. Ms. G. was also examined by hospital personnel and, upon discharge, was prescribed Motrin–400 mg every four hours for pain relief.

## D. Testimony of Officer James Denault

Officer James Denault, of the Hyattsville Police Department, collected evidence at the scene of the incident and assisted the lead investigator, Detective Rafael Redmond. He also made arrangements to have Ms. G. examined at Prince George's Hospital by a sexual assault forensic examiner ["SAFE"] nurse. The examination by a SAFE nurse was a separate examination from the one earlier performed at WHC and "was for the purpose of examining and collecting evidence for this case."

On cross-examination, Officer Denault and one of appellant's defense counsel had the following exchange:

Q. And as part of your work on this case that you talked about with [the prosecutor], you're aware that the victim went to Washington Hospital Center?

A. Yes, sir, [Ms. G.]

Q. And then while she was there—after she was finished there, you made arrangements for her to be taken to Prince George's Hospital with a nurse that you called; right?

A. Yes.

Q. So, you had a list of nurses that you routinely call in cases to help gather forensic evidence; right?

A. Yes.

Q. And you actually spent some time trying to track down a nurse and eventually reached a Ms. Slaughter?

A. Yes.

Q. And you called her and asked her to go and do a totally separate examination from Washington Hospital Center at Prince George's; right?

A. Yes, sir.

Q. And that was for the purpose of examining and collecting evidence for this case; right?

A. Yes, Sir.

On redirect examination, Officer Denault testified that it is part of police protocol to ask for an examination by a SAFE nurse in cases where a sexual assault has been alleged. Officer Denault agreed that he normally did not ask regular emergency room hospital personnel to perform sexual assault examinations.

### E. Testimony of Detective Rafael Redmond

Detective Redmond, of the Hyattsville City Police Department, received a report on January 6, 2008, that a man had contacted Hyattsville Police headquarters and reported that he had been robbed at the same address where Ms. G. claimed that she had been attacked. He reported back to police headquarters and discovered that appellant was the person reporting the robbery.

Appellant told Redmond that he was robbed at the house in question while he was there with Ms. G. Appellant said that he and Ms. G. went to the house, smoked marijuana, and then,

after Ms. G. removed her clothes and got on top of him, Ms. G. pulled a knife on him; after Ms. G. displayed the knife, two other individuals "came from somewhere inside the house and tried to rob him"; a struggle ensued, during which Ms. G. fell out a bedroom window; appellant then fled out the front door.

Detective Redmond took a photograph of appellant on the evening in question and prepared a photo array that included appellant's photo. Redmond then responded to the Washington Hospital Center where he showed Ms. G. the array. She selected appellant's photograph from that group of pictures, and told the detective that appellant was the person who "raped" her.

Ms. G. also told Detective Redmond that she was forced at knife point to perform oral sex on appellant and that appellant "stabbed her in the stomach." Further, Ms. G. reported that appellant had ordered her to get on "all fours," and that when she did so, "she felt like a knife was going inside of her anus."

Detective Redmond took photographs of some of Ms. G.'s injuries, and then, after she was discharged from Washington Hospital Center, "transferred her to Prince George's Hospital for a sexual assault examination."

Detective Redmond's testimony as to why Ms. G. was transferred to the Sexual Assault Center was as follows:

Q. Going to the next steps. Based on your information and knowledge of the case, did Diana [Ms. G.] go to another hospital other than where you were speaking to her at any point?

A. Yes.

Q. Please describe.

A. She was then, once she was discharged from the hospital, I think transferred her to Prince George's Hospital for a sexual assault examination.

Q. And with respect to that examination, do you request certain things of the examiner, or is it up to them what to do?

A. I request, and they also do what they normally do for their examination.

Q. Well, what do you request? How do you determine what to request of them?

A. Depending on the assault, but in this case *I requested a swab of her vagina, swab of her anus, a DNA swab of her mouth, and also a vaginal rape kit done.*

Q. *Did you request anything with respect to testing for drugs used based on her allegation?*

A. *Yes, ma'am.*

Q. Were you there for that examination? I guess what I'm saying, were you in the room when she was examined?

A. No.

Q. At some point, did you become aware that an examination was performed?

A. Yes.

Q. And that items had been collected upon your request?

A. Yes.

Q. Did you subsequently pick up those items?

A. Yes, I did.

(Emphasis added.)

### F. Records of the Sexual Assault Center

#### a. The Unredacted Records

The unredacted record was marked for identification but not admitted. That record showed that Ms. G. was admitted to the Sexual Assault Center at 12:09 a.m. on January 7, 2008, and discharged that same morning at 2:30 a.m. The record of Ms. G.'s visit to the Sexual Assault Center was prepared by Lisa Slaughter, a SAFE nurse.

Among the information collected by the SAFE nurse was: 1) information concerning the "assailant" including his nickname; 2) type of weapon used by the assailant; 3) the type of drug used by assailant "prior to assault"; 4) whether the

assailant was injured by victim; 5) date of victim's last consensual sexual contact; 6) a pain assessment; 7) amount of "illicit drugs" consumed by the victim at the time "of incident"; 8) a detailed history of the sexual assault, which included such information as a) whether a condom was used; b) whether there was anal or vaginal penetration by the assailant's penis; c) whether the victim was forced to perform oral sex; d) whether threat or weapons were used. In addition, a detailed physical examination was performed. Among the observations made during the physical exam by the SAFE nurse was her observation of the victim's anus. In this regard the report states that the "anal folds" were "positive" because there was a "tear at 6 o'clock and 4 o'clock" with "no bleeding noted." Also, the victim's chart includes a diagram of a woman with notations on the picture as to where various abrasions, puncture marks and scratches were observed on Ms. G.'s body. The diagram does not indicate that there was a tear in the anal folds.

The SAFE nurse also said in her report that, according to the victim, there was "no vaginal penetration." The nurse collected an anal swab and ordered lab tests to learn, *inter alia,* whether the victim was pregnant and whether drugs were in her urine. Upon discharge two types of medications were prescribed, to treat infections, i.e., Rocephin and Azithromycin.

### b. The Redacted Record

As already mentioned, the trial judge did not allow the entire record from the Sexual Assault Center to be admitted. Among the omissions were: 1) entries dealing with where the assault occurred and the identity of the assailant; 2) victim's medical history; 3) entries concerning the location and intensity of victim's pain; 4) entries concerning victim's ingestion of illicit drugs; 5) entries dealing with victim's history of assault on January 6, 2008; 6) test results, and 7) discharge instructions.

What the records that were admitted did include was the diagram of a woman's body showing where on Ms. G.'s body

abrasions, scratches and a "puncture"[5] were observed. The redacted record also included the page from Ms. G.'s chart dealing with the nurse's physical examination, which included the nurse's observation that her examination of the victim's anus showed a non-bleeding "tear" at "6 o'clock and 4 o'clock" of "the anal folds."

## II.

### The Trial Judge's Decision To Admit the Redacted Version of The Sexual Assault Center's Records

At trial the court and counsel held lengthy discussions as to what part of the Sexual Assault Center's record, if any, should be admitted in light of the fact that SAFE nurse Slaughter was unavailable. Defense counsel objected to the admission of any entry concerning what the SAFE nurse said she saw when she examined Ms. G. In particular, defense counsel objected to the nurse's observation that she saw "two tears" in the anal folds at the 4 o'clock and 6 o'clock positions. That entry, defense counsel argued, was "testimonial," and should not be admitted because Ms. Slaughter (the out-of-court declarant) was unavailable for questioning. Moreover, because the defense intended to argue that there had been no proof of anal penetration, the issue of whether there was a "tear" to the anal folds as opposed to merely a fissure, was, in the words of defense counsel, "central to Mr. Green's guilt or innocence on a charge that carries a life sentence."[6]

---

**5.** The diagram originally had the word "puncture from a knife," printed on the diagram, but the court ordered that the words "from a knife" be redacted.

**6.** In closing argument, the prosecutor placed considerable emphasis on the SAFE nurse's observation of the tear in the anal folds. The prosecutor argued:

So there's the gun to start if off, but then he probably knows what happens, accidents happen. He didn't trust himself with that, so he put that way (sic). He said, okay, get on the bed, turn around on all fours, now let's do it. Look at the SAC or sexual assault exam. You will see

The trial judge conceded that whether the nurse's observation of the anal tears was admissible was an important issue to the defense, but he nevertheless admitted the portion of the record containing that observation. The trial judge explained his ruling as follows:

> I do believe a lot of what the sexual assault nurse does is a forensic examination. I do believe a great deal of it is in anticipation of litigation. I do not believe all of it is for treatment.

The court continued:

> After looking at this, and knowing one side wants everything and one side doesn't, I do believe that at least part of what this nurse did was for medical purposes and does contain routine and descriptive and objectively ascertained and generally reliable facts in it.
>
> Therefore, I am going to admit the pages that I have right here in front of me, and I will let you see them, which is the cover sheet, the sexual assault cover sheet, and the following examinations, and I'm going to give you a copy of it. For the record, it will be Page 1, 14, 15, I think it's 16, it's smeared, 17 and one sheet diagram.
>
> However, even in those pages, I believe on Page 15 where it says, stab wound, I think the word stab is analytical and it is a conclusion. It is not an observation. To make it stab versus a puncture, I think that does require some type of analytical work as opposed to what one person might call a scratch versus one person calling it an abrasion. I think those are just terms of identification as opposed to terms of any analytical thinking.

---

that she did go there and they did do an anal examination, and they found tears in her anus.

At this time there's no bleeding noted, but you cannot deny the evidence of the assault. There were tears.

So she didn't make it up, that portion about her anus. Meaning, if you were inclined to believe because the testimony didn't come out smoothly, that she made that part up, exaggerated that part, again, you can't. An objective person looked at her anus and saw the tears exactly as she said. That's when she went berserk and the rest happened. Corroboration.

And I also believe on the diagram [of a woman], specifically, there is a wound above the belly button that says, puncture from knife. I think the word, from knife, is a conclusion and should not be admitted. But I think puncture is a term similar to a scratch or an abrasion, and I will let it in.

## III.

## Discussion

 The confrontation clause found in the Sixth Amendment to the United States Constitution states, in relevant part: "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." [7] The confrontation clause, with one major exception, generally protects the defendant from the government's use of statements made outside the courtroom as evidence in trial without calling the witness to testify. *Crawford, supra,* 541 U.S. at 43–43, 124 S.Ct. 1354 (2004). The major exception to that rule is that an out-of court statement may be used by the government against the accused if the out-of-court statement is "nontestimonial" in nature. *Id.* at 59, 124 S.Ct. 1354. In other words, absent confrontation, testimonial statements are excluded.[8]

---

7. The protections of the confrontation clause are applicable to the States through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

8. The *Crawford* Court acknowledged only one possible exception to its rule prohibiting, absent confrontation, the admission of testimonial hearsay. The court said:

 The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*
 *Crawford,* 541 U.S. at 56 n. 6, 124 S.Ct. 1354.

Although the *Crawford* Court did not provide a comprehensive definition of the word "testimonial," the *Crawford* Court did say:

> Various formulations of this core class of "testimonial" statements exist: *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; *statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."*

*Id.* at 51–52, 124 S.Ct. 1354 (internal quotation marks and citations omitted) (emphasis added).

The central issue that separates the parties in this appeal is whether the statements by the SAFE nurse fall within the "core class of testimonial statements" that we have emphasized in the just quoted excerpt from *Crawford.*

In *State v. Snowden,* 385 Md. 64, 867 A.2d 314 (2005), the task of the Court was to decide whether statements made to a sexual abuse investigator for Montgomery County, by three (alleged) victims of child abuse, were "testimonial" as that latter term was used in *Crawford. Id.* at 68–69, 867 A.2d 314. The *Snowden* Court concluded that utilizing objective standards, "an ordinary person in the position of any of the (three) declarants would have anticipated the sense that her statements to the sexual abuse investigator would have been used to prosecute" Snowden. *Id.* at 84–85, 867 A.2d 314. Therefore the *Snowden* Court said that the victims' statements were "testimonial" and could not be used because defense counsel was not given an opportunity to cross-examine the declarants. *Id.* at 84–85, 92, 867 A.2d 314.

In the case *sub judice,* appellant contends that the statements made by nurse Slaughter in her report that were

admitted into evidence were "testimonial" because a reasonable person in the declarant's (Ms. Slaughter) position would believe that the statements in her report "would be available for use at a later trial." *Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354. In support of that position, appellant points out in his brief that the duties of a SAFE nurse are, in large part, concerned with collecting evidence to be used at a criminal trial. We agree with appellant as to this point.

The Code of Maryland Regulations (COMAR) spells out the duties of a SAFE nurse, as follows:

(1) *Perform forensic evidentiary examinations on the victims and alleged perpetrators in connection with physical, sexual, or domestic assaults, whether chronic or acute;*

(2) *Before the forensic evidentiary examination, obtain consent from the individual being examined, from the parent or guardian of a minor individual, or from the proper authority for photographing and evidence collection;*

(3) *Prepare and document the assault history interview;*

(4) *Perform the forensic evidentiary physical assessment;*

(5) *Complete the physical evidence kit provided by law enforcement;*

(6) *Gather, preserve, handle, document, and label forensic evidence, including but not limited to:*

(a) *Labeling evidence collection containers with the patient's identification factors including police complaint number;*

(b) *Placing evidence in the evidence collection container and sealing the container;*

(C) *Signing the evidence collection container as the collector of the evidence;*

(d) *Taking photographs; and*

(e) *Obtaining swabs, smears, and hair and body samples;*

(7) *Maintain the chain of custody;*

(8) Provide immediate health interventions using clinical practice guidelines;

(9) Obtain consultations and make referrals to health care personnel and community agencies;

(10) Provide immediate crisis intervention at the time of the examination;

(11) Provide discharge instructions;

(12) *Participate in forensic proceedings including courtroom testimony;*

(13) *Interface with law enforcement officials, crime labs, and State attorney's offices;* and

(14) *Assist the licensed physician in performing a forensic evidentiary examination.*

COMAR 10.27.21.04A (emphasis added).

In regards to what a person in Ms. Slaughter's position would reasonably believe, it is important to note that after Ms. G. received medical attention at the WHC, Officer Denault and Detective Redmond sought out nurse Slaughter and asked her to examine Ms. G. and to perform various tests that were directly connected with the criminal case. As Officer Denault acknowledged, the victim was sent to the Sexual Assault Center "for the purpose of examining and collecting evidence for" the subject case.

The State maintains that the statements in Ms. Slaughter's redacted report were not testimonial. It argues:

It is precisely because Ms. Slaughter performed her examination of Ms. [Ms. G.] at the behest of the investigating officer in this case that Greene insists that the admission of her report in her absence violated *Crawford.* In *Rollins v. State,* 392 Md. 455, 897 A.2d 821 (2006), however the Court of Appeals *squarely addressed the issue of admissibility of reports like the SAFE nurse examiners's report in this case.* It did so in the context of a claim that an autopsy report was not admissible because it was prepared in the course of an investigation of a criminal matter and, therefore, inadmissible when the preparer of the report was not available for cross-examination. There, the Court held that regardless of whether the preparer of the autopsy report testified at trial, *the report itself was admissible as a*

*business record. Id.* at 483, 897 A.2d 821 (citing Md.Code Ann., Health–Gen. Art., § 5–311(d)(2006 Rep. Vol.) and Md.Code Ann., Cts. & Jud. Proc. Art., § 10–101(b)(2002)).

In doing so, the Court, in *Rollins,* rejected the assertion that the autopsy report was inadmissible because it was prepared in anticipation of use at a trial and, therefore, contained "testimonial" statements. To that end, the Court observed that "the autopsy report, while it might eventually be used in a criminal trial, *was not created for that express purpose,*" and the information contained therein "was statutorily required." *Id.* at 485, 897 A.2d 821. Consequently, the Court distinguished the admissibility of the autopsy report from the hearsay statements of the victims in *Snowden,* which were "elicited with the purpose of being introduced at a criminal trial." 392 Md. at 471, 897 A.2d 821. (Emphasis added.)

In *Rollins,* contrary to the State's argument, the court did not "squarely address [ ] the admissibility of reports like the SAFE nurse examiner's report in this case" nor did the *Rollins* court hold that "the [autopsy] report was itself admissible as a business record, regardless as to whether the 'preparer of the autopsy report testified.' "

In *Rollins,* the Court focused on a narrow issue, viz.: whether, in light of *Crawford* and subsequent Supreme Court cases dealing with the confrontation clause, an autopsy report was admissible even though the out-of-court declarant [the preparer of the report] was unavailable to testify. *Rollins,* 392 Md. 455, 486–87, 897 A.2d 821 (2006). The *Rollins* Court concluded that an autopsy report "is not *per se* testimonial"; instead, before being admitted the Court must look at the report and determine what parts are "testimonial" and what parts are non-testimonial. *Id.* at 486–87, 897 A.2d 821. The testimonial part of an autopsy report must be excluded, unless the defendant has the ability to cross-examine the preparer. *Id.*

The admissibility *vel non,* of nurse Slaughter's report is not controlled by *Rollins.* First, autopsy reports are required by

law when a death has occurred in "any suspicious or unusual manner." *See* Maryland Code (1982, 2005 Repl.Vol.) section 5–309(b) of the Health General Article; *see also, Rollins,* 392 Md. at 486, 897 A.2d 821. Unlike the report prepared by nurse Slaughter on behalf of the Sexual Abuse Center, an autopsy report is not prepared at the specific request of the police who are charged with uncovering criminal activity. Second, in many instances, autopsy reports are performed in cases of suicide, accidental deaths, and other situations where there is no victim. In contrast, reports prepared by SAFE nurses are *only* prepared in cases where the police suspect that a crime (sexual abuse) has occurred. These two differences are important because, in contrast to the preparer of an autopsy report, a SAFE nurse working in a Sexual Assault Center, who prepares a report on behalf of his or her employer, is quite obviously much more likely to reasonably believe that the statement he or she makes in that report will "be available for use at a later trial." *Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354.

Although the State does not say so explicitly, portions of its brief suggest that if the record fits within Maryland's business record's exception to the hearsay rule, such statements are not testimonial. The Supreme Court, in *Melendez–Diaz v. Massachusetts,* 557 U.S. ——, ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009),[9] explained why what the State suggests is not necessarily so. In *Melendez–Diaz,* Justice Scalia, speaking for the majority, said:

> Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. *See Fed. Rule Evid.* 803(6). *But that is not the case if the regularly conducted business activity is the production of evidence for use at trial.* Our decision in *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), made the distinction clear. There we held that an accident report provided by an employee of a railroad company did not

---

**9.** The *Melendez–Diaz* case was decided after *Rollins* and after the trial in the subject case.

qualify as a business record because, although kept in the regular course of the railroad's operations, it was "calculated for use essentially in the court, not in the business." *Id.,* at 114, 63 S.Ct. 477, 87 L.Ed. 645. The analysts' certificates—like police reports generated by law enforcement officials—do not qualify as business or public records for precisely the same reason. *See* Rule 803(8) (defining public records as "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel").

*Id.* at 2538 (footnote omitted)(emphasis added).

The *Melendez–Diaz* case concerned the issue of whether three certificates of analysts prepared by the Massachusetts Department of Public Health were testimonial. 129 S.Ct. at 2531. The certificates (deemed by the court to be affidavits') showed that three cellophane bags seized from the defendant when he was arrested contained cocaine. *Id.* In the *Melendez–Diaz* case, Justice Scalia said:

The fact in question is that the substance found in the possession of Melendez–Diaz and his codefendants was, as the prosecution claimed, cocaine—the precise testimony the analysts would be expected to provide if called at trial. The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination." *Davis v. Washington,* 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. Here, moreover, not only were the affidavits *"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,"* Crawford, supra, at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, but under Massachusetts law the sole purpose of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13. We can safely assume that the analysts were aware of the affidavits evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves. *See* App. to Pet. For Cert. 25a, 27a, 29a.

In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to "be confronted with" the analysts at trial. *Crawford, supra,* at 54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Id.* at 2532 (footnote omitted) (emphasis added).

In the subject case, based on the COMAR section quoted above, together with the testimony of Detective Redmond and Officer Denault, it is clear that it was the regular business activity of the Sexual Assault Center and nurse Slaughter to produce "evidence for the use at trial." *Id.* Thus, the fact that the report at issue would fit within the Maryland business records exception to the rule baring hearsay testimony, does not mean that the record was admissible without the defendant having a right to confront the preparer of the report. Moreover, in light of the fact that Ms. G. was sent to the Sexual Assault Center to help develop the State's criminal case, coupled with the fact that it is part of a SAFE nurse's job to collect and analyze evidence for use at trial, we hold that an objective witness in Ms. Slaughter's position would believe that the statements in her report "would be available for use at a later trial." *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354. Therefore, all statements in the report were "testimonial."

The State takes a contrary view when it argues:

[I]n this case, the fact that Ms. Slaughter's report might have been eventually used in the course of a criminal investigation does not alter the nature of her examination— to provide a health assessment and medical treatment to [Ms. G]. It is for this reason that Green's attempt to distinguish the report at issue in this case from that issue in *Rollins* is of no avail.

There are at least two major problems with this argument. First, nothing in the record supports the State's position that

the purpose of nurse Slaughter's examination was "to provide a health assessment and medical treatment to Ms. G." For starters, nothing in the record shows that at the time she arrived at the Sexual Assault Center, anyone thought that Ms. G. needed a medical assessment or additional medical treatment because she had already received the needed medical assessment and treatment at the Washington Hospital Center. No medical care provider transferred her because additional medical attention was needed. Instead, as already mentioned, the records show that WHC had assessed, treated and released Ms. G. shortly before she was transferred to the Sexual Assault Center at the request of the police. Second, the argument that nurse Slaughter examined the patient to provide medical care is undermined by the uncontradicted testimony of Officer Denault who said the police sent Ms. G. to the Sexual Assault Center "for the purpose of examining and collecting evidence for ... [the subject] case". The State stresses that nurse Slaughter *did* provide some medical treatment to Ms. G. This is true. The nurse prescribed medication, prepared a discharge plan,[10] and ordered lab and drug tests.[11]

---

**10.** The Discharge Plan read:

| | |
|---|---|
| Age appropriate literature give | √ |
| Criminal Injuries Compensation Info | √ |
| Medical follow-up instructions given | √ |
| Victim Advocate Services (SAC) | √ |
| Continue counseling (SAC) | √ |
| Continue counseling (other) | √ |
| ASC referral | √ |
| Discharge to home | √ |

**11.** The lab tests referred to were a pregnancy test and a toxicology screen. Although the matter need not be decided, it is doubtful that the pregnancy test was done for purposes of medical treatment. And, in regard to drug tests, Detective Redmond testified that he asked the Sexual Assault Center to perform those tests. In light of that testimony it would appear that the drug test was not for purposes of treatment.

The State argues that "given the dual purpose of Ms. Slaughter's examination, under *Rollins,* the redacted copy of her report was properly admitted." This argument is not persuasive. First, the parts of the record that the State contends concerned medical treatment (lab and drug reports, discharge plan, and medicines prescribed) were not contained in the redacted copy of nurse Slaughter's report that was admitted. But even if those items were all included, that fact has nothing to do with the issue we must decide, i.e., whether the preparer of the report, objectively speaking, would have believed that at the time the report was prepared that the statements she made in the report would be available for use at a later trial. The issue of what an objective witness would believe is answered by the fact that, by a large margin, the report mainly concerned matters directly related to why Ms. G. was sent to the Sexual Assault Center by the police, i.e., to develop evidence to be used at trial.

The State also contends that Judge Scalia's opinion in *Melendez–Diaz* "supports rather than alters" the conclusion that the redacted report was admissible. In the words of the State's brief:

Particularly germane to this case, however, is the Court's acknowledgment, in *Melendez–Diaz,* "medical reports created for treatment purposes . . . [are] not testimonial." 129 S.Ct. at 2533 n. 2. Here, Green does not contend that the SAFE nurse examiner did not treat [Ms. G.] in the course of performing an examination upon her. Under these circumstances, the report was admissible notwithstanding the absence of the examiner's testimony at trial.

The State, arguably at least, might be aided by the just quoted excerpt from *Melendez–Diaz* if the State could direct our attention to anything in the record that would suggest that the forensic nurse's report was created "for treatment purposes." The State has failed to do so.

The trial court in this case admitted into evidence the portion of Nurse Slaughter's report that, in the court's opinion, contained "routine and descriptive and objectively ascer-

tained and reliable facts" and deleted statements that were "analytical" or that contained "conclusion." In dealing with an autopsy report, the *Rollins* Court did appear to place its imprimatur on such an approach. 392 Md. at 487–92, 897 A.2d 821.[12]

Based on *Melendez–Diaz,* however, we do not believe that this approach would afford appellant with the protection intended by the confrontation clause, which commands not that "evidence be reliable" but that reliability be assessed by "testing in the crucible of cross-examination" *Melendez–Diaz,* 557 U.S. ——, 129 S.Ct. at 2536. It was for this reason that the *Crawford* Court jettisoned the test set forth in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under the *Roberts* test, notwithstanding the confrontation clause, out-of-court statements by witnesses were admissible if the statements had "particularized guarantee of trustworthiness." *Id.* In *Melendez–Diaz,* Justice Scalia speaking for the majority, explained:

> Respondent claims that there is a difference, for Confrontation Clause purposes, between *testimony recounting historical events, which is "prone to distortion or manipulation,"* and *the testimony at issue here, which is the "resul[t] of neutral, scientific testing."* Brief for Respondent 29. Relatedly, respondent and the dissent argue that confrontation of forensic analysts would be of little value because "one would not reasonably expect a laboratory professional . . . to feel quite differently about the results of his scientific test by having to look at the defendant." *Id.,* at 31 (internal quotation marks omitted); see post, at 2548–49, 174 L.Ed.2d at 339.
>
> This argument is little more than an invitation to return to our over-ruled decision in [*Ohio v.*] *Roberts,* 448 U.S. 56,

---

**12.** *See Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement,* 96 Cal. L.Rev. 1093, 1094, 1115 (2008) (noting, pre *Melendez–Diaz,* that every court post-*Crawford* has held that autopsy reports are not testimonial, and warning that a contrary rule would "effectively functio[n] as a statute of limitations for murder").

100 S.Ct. 2531, 65 L.Ed.2d 597, which held that evidence with *"particularized guarantees of trustworthiness"* was admissible notwithstanding the Confrontation Clause. *Id.,* at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. What we said in *Crawford* in response to that argument remains true:

> "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.* ... Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." 541 U.S. at 61–62, 124 S.Ct. 1354, 158 L.Ed.2d 177.

—— U.S. at ——, 129 S.Ct. at 2536 (emphasis added).

■ What a witness says in any out-of-court statement, can be testimonial even if the statement concerns a "fact." For instance in *Crawford, supra,* the issue was whether Sylvia Crawford's out-of-court statement to a police officer (that she didn't see a knife or other weapon in the victim's hand) was testimonial. *Crawford,* 541 U.S. at 52, 68, 124 S.Ct. 1354. Whether she saw a knife or not was obviously a "fact." Nevertheless, the court held that the statement was "testimonial." *Id.* Likewise, what two of the victims said in *Snowden* (that a person they knew as Uncle Mike touched them in their vaginal area) was held to be testimonial even though what the declarants said was unquestionably a "fact." 385 Md. at 68, n. 1, 92, 867 A.2d 314.[13] Recently in *Bullcoming v. New Mexico,*

---

**13.** We agree with what the author of the comment (Towards a definition of testimonial. How autopsy reports do not Embody the Qualities of Testimonial Statements, 96 Cal. L.Rev. 1093, 1110–11) said, viz.:

> The Supreme Court [in *Crawford*] specifically rejected the use of substance-based tests to classify a statement as testimonial. In accordance with its rejection, the Court chose to identify categories of testimonial statements by the context and method of production rather than by the content of the statement. Therefore, any substance-based test will always fail to categorize a statement properly as

—— U.S. at ——, 131 S.Ct. at 2714–15, —— L.Ed.2d at —— (2011), the Court said:

> [M]ost witnesses, after all, testify to their observations of factual conditions or events, e.g., "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain the answer is emphatically "No."

(Emphasis omitted, references to brief omitted.)

## Conclusion

■ We hold that the SAFE nurse who wrote the report at issue, did so under circumstances that would lead an objective witness to believe that the statement in the report would be available for use at trial. Accordingly, the nurse's statement fell within the "core class" of extra-judicial statements against which the confrontation clause protects. Thus all statements in the report, whether "factual" or otherwise were testimonial, and were inadmissible because appellant never had an opportunity to cross-examine the person who prepared the report. Because the trial court erred in allowing the State to introduce the redacted report, the case shall be remanded for a new trial.[14]

---

testimonial or non-testimonial. Under *Crawford*, a statement cannot be defined *as testimonial based on its substantive content*. Substantive tests fail in principle and application, and courts should resist any temptation to rely on a statement's substantive characteristics to define it as testimonial.

(emphasis added).

14. Because a new trial is being ordered, it is unnecessary for us to answer a second question raised by appellant, which was: Should

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

appellant's sentence for third-degree sexual offense, second-degree assault and reckless endangerment be merged for purposes of sentencing?