**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2407

September Term, 2012

---

ALEXANDER EUGENE MALASKA

v.

STATE OF MARYLAND

---

Meredith,
Kehoe,
Hotten,

JJ.

---

Opinion by Kehoe, J.

---

Filed: February 28, 2014

This tragic case arises out of a neighborhood dispute over a No Trespassing sign that ended when appellant, Alexander Eugene Malaska, shot and killed Dennis Liller. After a four-day trial by jury in the Circuit Court for Allegany County, Malaska was convicted of voluntary manslaughter and acquitted of second degree murder. Malaska appeals his conviction and presents three questions for our review, which we have rephrased:

I. Did the trial court violate Malaska's right of confrontation by admitting into evidence Liller's autopsy report through the testimony of the supervising medical examiner when the physical dissection was performed by a subordinate medical examiner who was not available for cross-examination at trial?

II. Did the trial court err in failing to instruct the jury as to the doctrines of "transferred intent self defense" and "defense of others"?

III. Did the trial court err in denying Malaska's motion to suppress statements he made during a police interrogation?

Applying principles enunciated in *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221 (2012), and *Derr v. State*, 434 Md. 88, 103 (2013) , we conclude that the autopsy report was testimonial in nature and that Malaska's confrontation rights were satisfied by the supervising medical examiner's availability for cross-examination. The trial court did not abuse its discretion in denying Malaska's requested "transferred intent self defense" instruction because the substance of the instruction was addressed in other instructions given by the court. Malaska's contention that the court erred in failing to give a defense of others instructions is not preserved for appellate review. The court did not err in denying Malaska's motion to suppress. We will affirm the conviction.

## Background

## The State's Case

Liller was fatally shot on March 28, 2012, in the front yard of Malaska's residence. The sequence of events leading to his death had its origins in a property dispute between the Malaskas and their neighbors. Malaska, his son, Michael Malaska ("Michael M."),[1] and Michael M.'s then-fiancee, Kelly Discher, lived in the Malaska home, which was located in a rural area of Allegany County. Liller and Kelly Spangler, his girlfriend, owned property situated adjacent to the Malaska property, which they used as a horse pasture or paddock. Kelly Spangler's parents, the Robertsons, lived in a home located on the other side of the paddock. Her husband,[2] Michael Spangler, lived in an apartment attached to the Robertson house. The Malaskas, on the one hand, and Kelly Spangler and Dennis Liller, on the other, claimed ownership of a cluster of trees located between the paddock and the Malaska property.

On March 28, 2012, Liller posted a "No Trespassing" sign in the disputed area. When Michael M. and Discher saw the sign, they tore it up and threw the pieces onto the Robertson's front lawn. This began a series of heated verbal altercations between the neighbors which culminated in a physical brawl in the Malaska front yard between Liller,

---

[1] Because there are two Malaskas and two Michaels involved in the incident, we will refer to Michael Malaska as "Michael M." in order to avoid confusion.

[2] Though they never divorced, Kelly and Michael Spangler had been separated for more than a decade at the time of the incident. They testified that, despite their separation, they remained on good terms.

Kelly Spangler, and Michael Spangler, on one side, and Michael M., on the other. As the fight was nearing its end, or immediately thereafter, Malaska, while standing on his front porch, fired a shot from a .22 caliber rifle. According to Kelly Spangler, the shot prompted her to drop to the ground, Liller to run in the opposite direction, and Michael Spangler to take cover behind a tree. Malaska fired at least one additional time and struck Liller in the back as he ran away. The bullet punctured Liller's aorta and he was dead by the time that emergency personnel reached the scene. Discher testified that she heard Malaska say "die, [obscenity deleted], die" after Liller was hit by the bullet.

### Appellant's Version of Events

Malaska, who was sixty-nine years old at the time of the incident, testified in his own defense and presented an alternative version of the events. According to Malaska, he was awoken from a nap by the noise emanating from the ongoing brawl in his front yard. He walked to his front door and saw: "Kelly Spangler beating my son with a cane," "Dennis Liller striking my son with his fists in the face," and "Mike Spangler kicking my son in the head." Michael M. was in a sitting position and was "limp," with his "arms down." Malaska retrieved a rifle, exited onto the front porch, and then fired "a warning shot in the air."

According to Malaska, the warning shot prompted Michael Spangler to turn toward him and ask "do you want a piece of this?" Spangler then charged at Malaska. Malaska testified that, "I got scared and I thought things had reversed. I am trying to help my son out and here is this large man coming at me. I was physically scared." As Michael Spangler

3

charged at him, Malaska "pointed the rifle towards him and [] fired." (He could not recall the number of times he fired). The shots at Michael Spangler prompted Liller to run toward Kelly Spangler's vehicle, which was parked on a gravel lot adjacent to the paddock. Malaska saw Liller fall to the ground, but testified that he did not know he had killed Liller until after he had been arrested and transported to the Cumberland City Police Station.

### The Interrogation and The Motion to Suppress

While at the police station, Malaska was read his *Miranda* rights. He then signed a written waiver of those rights. Thereafter, Malaska was interrogated by Corporal Martin of the Maryland State Police and Detective Dixon of the Allegany County Sheriff's Office. During the interrogation, Malaska stated "maybe I need an attorney" and "possibly I need an attorney." In reply, Corporal Martin explained, "if you want an attorney, no other questions will be asked of you." In response, Malaska expressed his desire to "make a statement right now" and said, "I don't need an attorney yet." Malaska then told the officers about the incident, including that, after firing the warning shot, Liller and certain unidentified others "just stopped and []ran" and that he fired the subsequent shots, not out of concern for Michael M., but because Michael Spangler had charged at him and he "was in fear for himself."

Prior to trial, Malaska moved to suppress the statements he made to Corporal Martin and Detective Miller. Malaska asserted that, even though he was read and signed a waiver of his *Miranda* rights, he had "explicitly invoked his right to counsel" during the

4

interrogation and that, therefore, the officers should have ceased their questioning. The trial court denied the motion, concluding that Malaska had failed to make "an unequivocal request for counsel." We will discuss Malaska's motion, and the trial court's ruling, in greater detail in Part III.

**The Autopsy Report**

Liller's body was transported to the Office of the Chief Medical Examiner for an autopsy. The physical dissection of Liller's body was performed by Cassie L. Boggs, M.D., under the supervision of Victor W. Weedn, M.D., J.D., then an assistant medical examiner. The autopsy report concluded that Liller died of a gunshot wound to his back and that the manner of death was homicide. The report was signed by Doctors Boggs and Weedn as well as by David R. Fowler, M.D., the Chief Medical Examiner. In discovery, the State disclosed that it intended to call Dr. Weedn as an expert witness to testify about the autopsy report and its conclusions. The State did not identify Dr. Boggs as a possible witness.

Malaska filed a motion in limine asserting that, unless Dr. Boggs testified, admission of the autopsy report or any evidence of its contents would violate his right of confrontation guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. The trial court conducted an evidentiary hearing on the motion outside the presence of the jury before Dr. Weedn testified and then denied the motion. Dr. Boggs did not testify. We will discuss the motion in Part I of this opinion.

5

**The Trial**

Malaska was tried before a jury on August 29-31 and September 4, 2012 on charges of second degree murder and voluntary manslaughter. The State's theory was that Malaska, motivated by Liller's role in the ongoing property dispute, intentionally shot and killed him. The State called twelve witnesses to testify, including Kelly Spangler, Michael Spangler, and Kelly Discher, all of whom testified as to their observations during the incident, and Dr. Weedn, who testified, over defense counsel's objection, about the results of Liller's autopsy. Dr. Boggs did not testify. The State also admitted the autopsy report into evidence, along with, among other evidence, Malaska's statement to Corporal Martin and Detective Miller.

Malaska called seven witnesses to testify in his defense. The crux of his defense, as set out in defense counsel's opening statement and closing argument, was that, after Malaska fired the warning shot, Michael Spangler threatened Malaska and charged at him, and that, during the charge, Malaska had, in the words of defense counsel, fired shots at Spangler "in self-defense against Michael Spangler." According to the defense, Malaska did not aim at, nor intend to shoot or kill, Liller.

At the close of evidence, defense counsel requested that the trial court instruct the jury as to "self-defense" and "transferred intent self-defense." Malaska points to certain "inaudible" parts of the trial transcript and asserts that defense counsel also asked for an instruction on the "defense of others." The trial court instructed the jury as to self-defense, but not transferred intent self-defense or defense of others. Malaska contends that the trial

6

court abused its discretion by failing to provide the latter two instructions. We will address these contentions in Part II.

After deliberating, the jury convicted Malaska of voluntary manslaughter and acquitted him of second-degree murder. He was sentenced to incarceration for a period of eight years. This appeal followed.

**Analysis**

**I. The Right of Confrontation**

Malaska asserts that the trial court's admission into evidence of Liller's autopsy report, and Dr. Weedn's testimony about the report's contents, violated his right to confront the witnesses against him, as guaranteed by the Sixth Amendment to the United States Constitution ("the accused shall enjoy . . . the right to be confronted with the witnesses against him"),[3] and Article 21 of the Maryland Declaration of Rights (an accused "hath a right . . . to be confronted with the witnesses against him"). This is so, he continues, because Dr. Weedn neither performed the autopsy dissection nor wrote the report. Asserting that, at most, Dr. Weedn supervised (to some degree) Dr. Boggs' performance of the dissection, and edited, approved, and signed the final report, Malaska maintains that, in order to admit evidence concerning the results of the autopsy, the State was required to call Dr. Boggs as a witness.

---

[3]The Sixth Amendment applies in Maryland through the Due Process Clause of the Fourteenth Amendment. *See Green v. State*, 199 Md. App. 386, 399 n.7 (2011); *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

7

The confrontation rights set forth in the Sixth Amendment and Article 21 have been read *in pari materia*—i.e., "as generally providing the same protection to defendants." *Derr v. State*, 434 Md. 88, 103 (2013) ("*Derr II*"); *Cooper v. State*, 434 Md. 209, 232 (2013). Together, they act to "protect[] the defendant from the government's use of statements made outside the courtroom as evidence in trial without calling the witness to testify." *Green v. State*, 199 Md. App. 386, 399 (2011). These rights apply where: 1) the challenged out-of-court statement or evidence is presented for its truth, and 2) the challenged out-of-court statement or evidence is testimonial—i.e., bears indicia of solemnity. *Derr II*, 434 Md. at 106-07, 112-13; *Cooper*, 434 Md. at 233. If these conditions are satisfied, the State is prohibited from introducing the statement unless: 1) the declarant is unavailable to testify as a witness at trial; and 2) the defendant had an opportunity to cross-examine the declarant prior to trial. *Derr II*, 434 Md. at 107.

Malaska asserts that the autopsy report and Dr. Weedn's testimony about the report were testimonial and introduced for the truth of the matters recounted therein. He argues that, having failed to show that Dr. Boggs was unavailable to testify as a witness at trial and, moreover, having failed to make Dr. Boggs available for cross-examination prior to trial, the State should have been precluded from introducing the report and its contents into evidence. Malaska contends that he suffered prejudice as a result of the admission of this information because the report and its contents: 1) established that Liller died of a gunshot wound to the back, 2) stated that the cause and manner of Liller's death was homicide, and 3) suggested

8

that Malaska testified inaccurately as to certain details about the incident—namely, the timing of when Liller fled from the scene.[4]

The State suggests in response that it is "unclear" as to whether the autopsy report and Dr. Weedn's testimony about the contents of the report satisfy the second prong of the *Derr II* test—i.e., the requirement that they be "testimonial." The State contends, alternatively, that, even if Malaska's confrontation right was implicated by the admission of the autopsy report and its contents, it was not violated because Dr. Weedn testified and was subjected to cross-examination at trial. In support of its latter point, the State argues that, as the supervising medical examiner who not only diagnosed the cause and manner of Liller's death but also edited, approved, and signed the autopsy report, Dr. Weedn was an appropriate witness, for confrontation purposes, through which to introduce details of Liller's autopsy. The State highlights Dr. Weedn's testimony that, while Dr. Boggs performed the autopsy dissection, he was present in the autopsy suite while the procedure was ongoing (though he was supervising several—up to three—autopsies simultaneously), and carried the ultimate authority and responsibility for the procedure and the diagnosis.

In assessing these contentions, we must first determine whether Malaska's right of confrontation was implicated by the trial court's admission into evidence of the autopsy report and its contents. Applying the two-prong test set forth in *Derr II*, we conclude that it

---

[4]Several witnesses testified that Liller fled as soon as Malaska fired the first warning shot. Malaska, in contrast, testified that Liller did not run until subsequent to the shots he fired at Michael Spangler.

was. The right having been implicated, we next determine whether the admission of this evidence violated Malaska's right to confront the witnesses against him. For the reasons explained below, we conclude that it did not. We begin with the *Derr II* test.

## A. In The Nature of Testimony?

Because the parties do not dispute that the autopsy report and its contents were admitted for the truth of the matters asserted therein, we focus our analysis on the remaining prong of the *Derr II* test, namely, whether the report and its contents were sufficiently testimonial to implicate Malaska's right of confrontation.

In *Derr v. State*, 422 Md. 211 (2011) ("*Derr I*"), the Court of Appeals explained that, under the rule adopted by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004) and applied in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S.Ct. 2705 (2011), "any statement that was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial is considered to be testimonial." 422 Md. at 236 (quotation marks and citations omitted). The issue in *Derr I* was whether the results of a serological exam and two related DNA reports were sufficiently testimonial in nature to implicate the defendant's right to confront the person who performed the scientific tests and/or examinations underlying the reports. Applying the standard set forth in *Crawford*, *Melendez-Diaz*, and *Bullcoming*, the Court of Appeals answered this question in the affirmative. *Id*. at 237, 248-49. In so doing, the Court expressly overturned its prior decision

10

in *Rollins v. State*, 392 Md. 455 (2006), in which it had determined that the contents of a redacted autopsy report[5] were not "testimonial" because they were not created for the express purpose of being used as evidence in a criminal proceeding, and that they instead qualified under the business records exception to the hearsay rule. 422 Md. at 234-36. The *Derr I* Court, interpreting *Crawford* and its progeny as rejecting the "express purpose" test utilized in *Rollins,* made it clear that the determination of whether an autopsy report is "testimonial" should be assessed under the standard set forth by the Supreme Court—*i.e,* whether an objective witness would reasonably believe that the statement would be available for use at a later trial. *Id*. at 235-36.

Subsequently, in *Maryland v. Derr*, ___ U.S. ___, 133 S.Ct. 62 (2012), the Supreme Court vacated the *Derr I* decision and remanded the case to the Court of Appeals for reconsideration in light of its decision in *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221 (2012). The pertinent issue in *Williams* was whether a report containing DNA analysis was "testimonial." The case produced a plurality of approaches to the issue, the most important of which, for our purposes, was the one articulated by Justice Thomas in his concurring opinion. Justice Thomas determined that the confrontation right "regulates only the use of statements bearing 'indicia of solemnity,'" for example, "depositions, affidavits, and prior testimony, or statements resulting from 'formalized dialogue,' such as custodial interrogation," 132 S.Ct. at 2259-60, along with "the use of technically informal statements

---

[5]The redacted part of the autopsy report contained the medical examiner's ultimate conclusions as to the victim's cause of death. *Rollins*, 392 Md. at 484-85.

11

when used to evade the formalized process." *Id*. at 2260 n.5. Applying this "indicia of solemnity" test to the DNA report at issue, Justice Thomas concluded that the report was not testimonial because it did not constitute a "sworn [or] certified declaration of fact." *Id*. at 2260. In support of this conclusion, Justice Thomas observed that the report was "not the product of any sort of formalized dialogue resembling custodial interrogation," that it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained," and that, even though the report was signed by two "reviewers," it was not signed by those who "purport to have performed the DNA testing." *Id*.

On remand, the Court of Appeals in *Derr II* adopted Justice Thomas's approach in determining whether a statement is "testimonial" for confrontation clause purposes (what we refer to as the "*Derr II* test"). 434 Md. at 115-16. Applying this approach to the results of the serological exam, the Court concluded that the report was not "sufficiently formalized to be testimonial." *Id*. at 118-19. As the Court observed:

> The exhibit in the record pertaining to the serological examination appears to be the notes from the bench work of the serological examiner. There are no signed statements or any other indication that the results or the procedures used to reach those results were affirmed by any analyst, examiner, supervisor, or other party participating in its development. Like the [] report at issue in *Williams*, the serological examiner's notes "lack[ ] the solemnity of an affidavit or deposition, for [they are] neither a sworn nor a certified declaration of fact[,]" nothing on the notes "attest[s] that [their] statements accurately reflect the ... testing processes used or the results obtained[,]" there is no signed statement from a person who did the test or someone "certify[ing] the accuracy of those who did" and, although the serological examination was performed "at the request of law enforcement," the results are "not the product of any sort of formalized dialogue resembling custodial interrogation."

12

*Id*. at 118-19 (quoting *Williams*, 132 S.Ct. at 2260 (Thomas, J., concurring)). Likewise, the Court concluded that the DNA reports were not sufficiently formalized to be testimonial because the reports lacked statements attesting or certifying to the accuracy of the procedures used or the results obtained therefrom. *Id*. at 119-120.

Most recently, in *Cooper v. State*, the Court of Appeals applied the *Derr II* test to a DNA report similar to the ones at issue in the *Derr* case. The Court concluded that the report was not sufficiently testimonial to implicate the confrontation right because, "[n]owhere on either page of the report . . . is there an indication that the results are sworn to or certified or that any person attests to the accuracy of the results," 434 Md. at 236, and because "the [] report is not the result of any formalized police interrogation." *Id*.

Applying the *Derr II* test to the autopsy report at issue in the case before us, the report is surely not the product of any sort of formalized dialogue resembling custodial interrogation. Therefore, our focus is on whether the report contains formalized indicia such as attestations and/or certifications as to the accuracy of the testing processes used or the results obtained therefrom. In our view, the autopsy report does, indeed, contain formalities of this nature. The last page of the report—the page on which the results of Liller's autopsy are summarized—contains three signatures: those of Dr. Boggs, Dr. Weedn, and Dr. David Fowler, the Chief Medical Examiner for the State of Maryland. Of these, both Dr. Boggs and Dr. Weedn were personally involved in the autopsy of Liller. Although the report does not employ the words "attest" or "certify" or any variation thereof, the signatures clearly imply

13

that the signatories agree with and approve the contents of the report.

In addition, several Maryland statutory provisions are instructive. Md. Code (1982, 2009 Repl. Vol.) § 5-309(a)(1) of the Health-General Article ("HG") provides that "[a] medical examiner shall investigate the death of a human being if the death occurs: (i) by violence; . . . ." In such an event, "the police or sheriff immediately shall notify the medical examiner and State's Attorney for the county where the body is found and give the known facts concerning the time, place, manner, and circumstances of the death." HG § 5-309(b). "If the medical examiner who investigates a [§ 5-309(a)] death considers an autopsy necessary, the Chief Medical Examiner, a deputy chief medical examiner, an assistant medical examiner, or a pathologist fellow authorized by the Chief Medical Examiner shall perform the autopsy." HG § 5-3010(b)(1). During the progress of the autopsy, "[t]he individual who performs the autopsy shall prepare detailed written findings" and, thereafter, shall file a copy of the report "in the office of the medical examiner for the county where the death occurred" and the original "in the office of the Chief Medical Examiner." HG § 5-310(d)(1). HG § 5-311(d)(2) states that, "a record of the Office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control . . . is competent evidence in any court in this State of the matters and facts contained in it."

We recognize that this is an evolving area of the law and that the Court of Appeals has not addressed the specific question before us in light of *Williams v. Illinois*. Pending further

14

instruction from the Court, we hold that the formalities required by the statutes, together with the signatures of Doctors Fowler, Weedn and Boggs, render the autopsy report in the instant case sufficiently formalized to be "testimonial" for purposes of the confrontation clause.

## B. The Out-of-Court Statements . . . of Dr. Boggs or Dr. Weedn?

Having determined that the trial court's admission of the autopsy report and its contents implicated Malaska's confrontation rights, we turn next to the question of whether Malaska's rights were violated on the facts before us. The resolution of this issue turns on whether Dr. Weedn was, for confrontation purposes, a proper witness through which to admit the autopsy report and its contents, or whether, instead, the report and its contents were attributable to Dr. Boggs to such an extent as to mandate that she testify about them at trial. If, as the State contends, Dr. Weedn was sufficiently involved in the autopsy and the drafting of the report to satisfy confrontation clause requirements, then our analysis necessarily ends because Dr. Weedn testified and was subjected to cross-examination at trial. If not, then we must determine the consequences of Dr. Boggs' absence at trial.

Where, as here, there is no dispute that the statements being challenged on confrontation grounds were made "out-of-court," the relevant inquiry focuses on whether the statements were made by "an absent witness." *Derr II*, 434 Md. at 106-07. To answer this question, we must first identify the declarant—or declarants, as the case may be—of the statements being challenged. This determination is complicated on the facts before us by the respective roles of Dr. Weedn and Dr. Boggs in performing the autopsy—i.e., the

15

relationship between supervisor and subordinate. On one hand, there is no dispute that Dr. Boggs, a "forensic pathology fellow"—essentially, a forensic pathologist in training—performed the autopsy dissection and wrote the initial draft of the autopsy report. On the other, Dr. Weedn was, in his words, "the attending physician," who supervised the autopsy and edited, approved, and signed the report.

In support of his position that Dr. Boggs was the proper—and, indeed, only—witness through which to admit the autopsy report and its contents for confrontation purposes, Malaska relies on *Bullcoming v. New Mexico*, 131 S.Ct. 2705. The facts of that case were succinctly set forth by the Court of Appeals in *Derr II*:

> In *Bullcoming*, the defendant was arrested and charged with driving while intoxicated (DWI) and the "[p]rincipal evidence against [the defendant] was a forensic laboratory report certifying that [the defendant's] blood-alcohol concentration was well above the threshold for aggravated DWI." Rather than calling the analyst who signed the certification as a witness, the state called "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample."

434 Md. at 108 (quoting *Bullcoming*, 131 S.Ct. at 2709) (citations omitted, brackets added by *Derr II*).

Observing that the surrogate analyst was ill-equipped to testify as to "what [the certifying analyst] knew or observed about the events his certification concerned, *i.e.,* the particular test and testing process employed" and, thus, was unable to "expose any lapses or lies on the certifying analyst's part," *Bullcoming*, 131 S.Ct. at 2715, the Court held that the confrontation clause required "the analyst who made the certification" to testify at trial

16

"unless that analyst [was] unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine [that particular analyst]." *Id*. at 2710; *see also Melendez-Diaz*, 557 U.S. at 319 (confrontation acts to "weed out" "the incompetent [analyst]" and is a "means of assuring accurate forensic analysis. . . . Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony."); *but see Bullcoming*, 131 S.Ct. at 2722 (Sotomayor, J., concurring) (recognizing that a distinction exists, for confrontation purposes, between a witness with "a lack of connection to the test at issue"—i.e., a surrogate witness—and a "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue"); *Derr I*, 422 Md. at 237 (suggesting that, for confrontation purposes, either the analyst who performed the test or a supervisor who observed the analyst perform the test must testify at trial).

Malaska argues that, like the surrogate analyst in *Bullcoming*, Dr. Weedn played little, if any, role in performing the autopsy dissection of Dennis Liller or in writing the autopsy report. In support of this position, Malaska points to the testimony of Theresa Chamberlayne, a crime scene technician who testified that she "attend[ed]" the autopsy of Liller, meaning that she observed the entire autopsy dissection from "a second floor observation deck."[6]

---

[6]Malaska contended at oral argument that Ms. Chamberlayne was "at the autopsy table" while Dr. Boggs performed the autopsy dissection. This contention is not borne out by the record. Ms. Chamberlayne testified that "in the Medical Examiner's Office we [i.e., crime scene technicians] are located on a second floor observation deck so we are [] seated a floor up. So we're . . . observing through a glass wall and [the forensic pathologist] is a

(continued...)

When asked by defense counsel whether she had "any contact with Dr. Weedn" during the autopsy, Ms. Chamberlayne replied, "Not that I can recall." Later, when again asked by defense counsel whether she had "any contact with Dr. Weedn," Ms. Chamberlayne replied, "No I did not." During cross-examination, Ms. Chamberlayne testified that there were other autopsy dissections ongoing at the time (although she could not recall a precise number), that approximately ten to twelve medical professionals were present in the autopsy suite during Liller's autopsy (all of whom were dressed in surgical masks and scrubs), and that she did not know Dr. Weedn. She further testified that she was not present during the drafting of the autopsy report nor during any discussions that Dr. Boggs may have had with anyone relating to Liller's autopsy.

Malaska maintains that Ms. Chamberlayne's testimony established that, even if Dr. Weedn was in the autopsy suite at the time the procedure was performed, he did not directly observe or interact with Dr. Boggs during the dissection. We read Ms. Chamberlayne's testimony differently. She testified, not that Dr. Weedn failed to supervise or observe Dr. Boggs's performance of the autopsy dissection, but, rather, that she did not recognize him or have direct contact with him from her observation post on the second floor.

Likewise, we read Dr. Weedn's uncontradicted trial testimony differently than does Malaska. Malaska maintains that Dr. Weedn's testimony related only to his role in the performance of autopsies generally, and not specifically with respect to Liller's case. Dr.

---

[6](...continued)
floor below."

18

Weedn, in fact, testified that "[t]his particular case was assigned to me" and that "I performed this autopsy with the assistance of [] forensic pathologist fellow Cassie Boggs." When defense counsel inquired into the matter further, Dr. Weedn repeated, "Dr. Boggs assisted me." Malaska asserts that Dr. Weedn's "testimony shows only that [he] was somewhere in the autopsy suite, which contains multiple rooms and at least sixteen autopsy tables." As to this point, Dr. Weedn testified that, "I was present for the entire autopsy" and that "I was there in the autopsy suite, in the area for the entire time," meaning that he was "walking back and forth in the suite," "moving from table to table," supervising "all [the] autopsies [being performed at that time]." His testimony makes it clear that the "autopsy suite" in which Liller's dissection was performed was a single room, with eight dissection stations,[7] and that the suite was one of many in the medical facility.

Dr. Weedn further testified that the dissection—on which Malaska primarily focuses—is but a part of the overall autopsy process, of which Dr. Weedn was involved in and supervised. He testified that the remaining steps in the process include, among other things, conducting various chemical and other tests, if deemed to be necessary, and condensing the information obtained from the various parts of the process into a final autopsy report, which, though initially drafted by Dr. Boggs, Dr. Weedn edited, approved, and signed.

---

[7]Dr. Weedn could not recall the exact number of autopsies he supervised while Liller's autopsy was ongoing, but testified that Dr. Boggs was one of three forensic pathology fellows employed at that time. There is no dispute that there were eight dissection stations in the autopsy suite, and, thus, enough work stations for all three fellows to have been performing dissections while Dr. Boggs performed the dissection of Liller.

19

Further, Dr. Weedn's uncontradicted testimony was that, even though he did not physically perform the dissection, or physically conduct the chemical and other tests conducted on Liller (which were performed by lab technicians), "I review all the slides and [the autopsy results are] my interpretation o[f] the slides," and, that, after discussing the dissection and other test results with the assigned forensic pathology fellow (i.e., Dr. Boggs in this case), he—and not the fellow—makes the ultimate determination as to the cause and manner of death.

The testimony of Ms. Chamberlayne and the testimony of Dr. Weedn does not convince us that the rule set forth in *Bullcoming* concerning surrogate witness testimony is applicable here. It was uncontested in *Bullcoming* that the surrogate witness in that case was not the supervisor in charge of conducting the scientific tests at issue, and, further, that the witness had no knowledge as to the actual tests completed or the actual chemists' job performance. Here, in contrast, the record established that Dr. Weedn was involved in, and had first-hand knowledge of, the tests and procedures employed during Liller's autopsy, as well as Dr. Boggs' performance in conducting the dissection. Thus, the primary concern of the *Bullcoming* Court—that the surrogate analyst lacked knowledge of the "particular test and testing process employed" by the certifying analyst in reaching the conclusions set forth in the certification, 131 S.Ct. at 2715—is not present in the instant case. Rather, the scenario before is us much closer to the one recognized by Justice Sotomayor in her concurring opinion in *Bullcoming*, 131 S.Ct. at 2722 (Sotomayor, J., concurring) (suggesting that the outcome of *Bullcoming* may have been different "if, for example, a supervisor who observed

20

an analyst conducting a test testified about the results or a report about such results.”).[8]

Our task, therefore, is to determine whether it is sufficient, for confrontation purposes, for a supervisor who was present at the scene and involved in the process to testify about the results of an autopsy, or whether the assistant who physically performed the dissection—Dr. Boggs, in the instant case—is required to also testify.

Bearing in mind the concerns the confrontation right is intended to militate against, as expressed by the Supreme Court in *Crawford, Melendez-Diaz*, and *Bullcoming*, and the Court of Appeals in *Derr II*, it is our view that the evidence established that both Dr. Weedn and Dr. Boggs were involved in the autopsy of Liller in their respective roles. However, because Dr. Weedn—and only Dr. Weedn—carried the responsibility and authority to make the ultimate determination as to the cause and manner of death, we conclude that he was a proper witness, for confrontation clause purposes, through which to admit the results of the autopsy report including the conclusion that Liller died of a gunshot wound to the back. Because Dr. Weedn testified at trial and was subjected to cross-examination about the testing processes and procedures employed under his supervision, along with the methodology that he used to determine the cause and manner of Liller's death, we are not persuaded that Malaska was robbed of his right to confront the witnesses against him. We have found no authorities—and Malaska cites to none—which suggest that, where a supervisor and an

_____

[8]Despite Malaska's attempts to portray it as such, this is not a case where the supervisor was physically absent from the place where the scientific test or procedure was being performed, or where the supervisor otherwise failed to fully or properly execute his or her supervising duties.

assistant are involved in their respective roles in performing a test or scientific procedure, or in contributing to a scientific report, the Sixth Amendment mandates that both be called to testify.[9]

## II. The Jury Instructions

Next, Malaska contends that the trial court erred in its instructions to the jury in two ways: first, by failing to instruct the jury as to the doctrine of "transferred intent self-defense," and, second, by failing to give a "defense of others" instruction. We will take each of these contentions in turn, reviewing the trial court's decision not to grant the identified instructions for an abuse of discretion. *See Gimble v. State*, 198 Md. App. 610, 627 (2011). In determining whether the trial court abused its discretion, we consider "(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Bazzle v. State*, 426 Md. 541, 549 (2012). An instruction is "applicable under the facts of the case" when a defendant can point to "some evidence ... [that] supports the requested instruction. Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says— 'some,' as that word is understood in common, everyday usage." *Id.* at 551 (quotation marks and citations omitted).

## A. Transferred Intent Self-Defense

---

[9]Because we find no error in the trial court's admission of the autopsy report and its contents, we will not address the State's alternative contention that, if in error, the admission of this evidence was harmless.

At trial, defense counsel requested that the court instruct the jury as to the doctrine of "transferred intent self-defense"; specifically, that the trial court provide the jury with "an instruction stating that intent under self-defense can transfer to another just as the intent to kill can transfer from the intended victim to an innocent bystander." According to Malaska, pursuant to this instruction:

> If [he] had shot and killed Michael Spangler in self-defense, as intended, he wouldn't be guilty of second degree murder or manslaughter. Consequently, any self-defense argument used to mitigate [his] actions with respect to Michael Spangler would similarly transfer to the unintentional shooting of Liller—acting as a defense against the killing of Liller.

Malaska argues that a separate "transferred intent self defense" instruction was necessary because the instructions given by the court "never empowered the jury to connect (1) Mr. Malaska's claim that he was responding reasonably to an attack, with (2) the death of Mr. Liller." The trial court denied Malaska's request.

Malaska does not cite any Maryland authority but instead points to cases such as *Holloman v. State*, 51 P.3d 214, 221 (Wy. 2002). In *Holloman*, the Supreme Court of Wyoming, after collecting authorities on the subject, summarized the doctrine of transferred intent self-defense as follows:

> the courts refer to a "transferred intent" self-defense theory to justify the accidental killing of a bystander. Under this theory, the courts reason that if transferred intent in its principal application, establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences, ... [then] the reasoning applies equally to carry the lack of criminal intent to the unintended consequences and thus preclude criminal responsibility. Accordingly, if self-defense is justified against the intended victim and would excuse the assault or homicide of that victim, then the assault or homicide of

23

the unintended victim is excused or justified, and no criminal conviction can be obtained.

51 P.3d at 221-22 (quotation marks and citations omitted); *see also, e.g., People v. Conley*, 713 N.E.2d 131, 136 (Ill. App. Ct. 1999); *State v. Owens*, 601 N.W.2d 231, 236-27 (Neb. 1999); *People v. Morris*, 491 N.Y.S.2d 860, 862 (N.Y. App. Div. 1985).

Maryland's approach is conceptually different because we no longer frame the problem of assessing responsibility for the unintended consequences of criminal acts in terms of whether criminal intent "follows the corresponding criminal act to its unintended consequences." *Poe v. State*, 341 Md. 523, 530 (1996), is the landmark decision in this area.

In that case, the defendant shot at and wounded his estranged wife in the arm. The bullet, however, passed through Poe's ex-wife and unintentionally killed her boyfriend's six-year old daughter, who was nearby. Poe argued that the doctrine of transferred intent—which provides, in relevant part, that, even where an accidental victim is killed, the intent to kill still exists if the defendant intended to kill someone else—was inapplicable because the bullet had successfully wounded its intended target. In rejecting this argument, the Court focused its analysis, not on the *actus reas* of the defendant, i.e., that he wounded the intended victim and killed an unintended victim, but, instead, on the *mens rea* of the defendant at the time he pulled the trigger: "The defendant fails to recognize, however, that his intent was to murder, not to attempt to murder." *Id.* The Court concluded that, at the operative time, the defendant intended to kill, and that this *mens rea* was sufficient for the jury to find him guilty of murder, even though his actions carried unexpected results. As Judge Charles E. Moylan, Jr.,

explained in CRIMINAL HOMICIDE LAW 84 (2002):

> *Poe* was a doctrinal breakthrough. The transferred intent doctrine assumed greater utility once we freed ourselves from the constraints that were the unintended consequences of its metaphorically inapt label. Once we stopped conceptualizing a defendant's *mens rea* as a single finite unit that might be 'transferred' from one *actus reas* to another, we were free to view it as a pervasive state of moral fault of criminal purpose . . . that could influence any number of expected or unexpected consequences. . . .

Malaska asks, in essence, that we recognize "transferred intent self-defense" as a unique form of self-defense which, where applicable, necessitates a separate instruction to the jury. The problem with this contention is that, in similar fashion to the defendant in *Poe*, Malaska's argument places too much emphasis on the *actus reas*, the results of his actions—i.e., that he killed Liller and not Michael Spangler. However, as *Poe* teaches, the pertinent focus, in cases of transferred intent, is on the defendant's *mens rea* at the time the fatal shot was fired. Applying this principle to the instant case, the appropriate question for the jury was not whether Malaska's actions resulted in the death of Liller as opposed to Spangler, but whether Malaska had the requisite mental state for self-defense at the time he pulled the trigger.

With respect to self-defense, the trial court provided the jury with several instructions. The court first instructed that:

> You have heard evidence that [Malaska] killed Dennis Liller in self-defense. You must decide whether this is a complete defense, a partial defense, or no defense in this case. In order to convict [Malaska] of murder the State must prove [Malaska] did not act in either complete self-defense or partial self-defense. . . . If [Malaska] did act in complete self-defense, your verdict must be not guilty. . . . If [Malaska] did not act in complete self-defense but did act

25

in partial self-defense, your verdict must . . . be guilty of voluntary manslaughter and not guilty of [second degree] murder.

The court then set out the elements of complete and partial self-defense. As to complete self-defense, the trial court instructed:

Self defense is a complete defense and you are required . . . to find the Defendant not guilty if all of the following factors are present: one, that the Defendant was not the aggressor; two, the Defendant actually believed he was in immediate [] and imminent danger of death or serious bodily harm; and three, that the Defendant's belief was reasonable; and four, that the Defendant used [no] more force than was reasonably necessary to defend himself in light of the threatened or actual force.

The court then instructed:

Even if you find [Malaska] did not act in complete self defense, [Malaska] may still have acted in partial self defense. If [Malaska] actually believed he was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, [Malaska's] actual, though unreasonable belief is a partial self defense and . . . the verdict . . . should be guilty of voluntary manslaughter.

Thus, as to intent, the jury was instructed that Malaska acted in self-defense if: 1) he "actually believed he was in immediate [] and imminent danger of death or serious bodily harm"; and 2) his "belief was reasonable." *Compare with Dykes v. State*, 319 Md. 206 (1990) (self-defense arises where, among other requirements, the defendant "had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant"). The jury was also instructed that Malaska acted in partial self-defense if he "actually believed he was in immediate and imminent danger of death or serious bodily harm" even though this belief was unreasonable. *Compare with*

26

*Dykes*, 319 Md. at 213 ("Imperfect self-defense . . . requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so."). Pursuant to these instructions, if Malaska actually believed he was in sufficient danger, he had the requisite *mens rea* for self-defense and/or partial self-defense, regardless of whether his actions resulted in unintended consequences. We conclude that the trial court's instructions fully and fairly permitted the jury to find that, even though Malaska killed Liller, he fired the fatal shot in complete or partial self-defense against Michael Spangler. *See Cost v. State*, 417 Md. 360, 369 (2010) ("Reversal is not required where the jury instructions, taken as a whole, sufficiently protected the defendant's rights and adequately covered the theory of the defense."). Indeed, applying the above-quoted instructions, the jury acquitted Malaska of second degree murder and convicted him of voluntary manslaughter, thereby accepting Malaska's contention that his actions constituted a partial self-defense to Spangler's aggressions. The trial court did not abuse its discretion by declining to provide a separate "transferred intent self-defense" instruction in light of the self-defense instructions actually given.

### B. Defense of Others

Malaska asserts: 1) that a defense of others instruction should have been given because Malaska "presented evidence showing that he was in fear for both his life and the life of his son when he attempted to protect himself from Michael Spangler"; and 2) that

defense counsel lodged an objection on the record to the trial court's failure to provide the jury with this instruction, thus preserving the matter for appellate review. We agree with the first but not the second contention.

There was—barely—some evidence that would have supported a defense of others instruction. In an interview shortly after the shooting, Discher told the police that Malaska had been acting to defend his son. She testified differently at trial but her prior statement was admitted into evidence without objection. Other than Discher's statement, there was no other evidence presented to the jury that Malaska was acting in defense of his son. For his part, Malaska testified that he fired the fatal shot to protect himself. We turn to the issue of preservation.

### 1. Preservation

Prior to trial, Malaska requested in writing that the trial court provide the jury with a defense of others instruction. After the close of evidence, the trial court discussed proposed instructions at length with counsel. Malaska's counsel did not raise defense of others as a desired instruction at that time. What is critical for the purpose of preservation is what occurred after the court completed its instructions to the jury. *See* Md. Rule 4-325(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."). Malaska asserts that defense counsel objected at that juncture to the trial court's failure to give such an instruction.

28

The difficulty with this contention is that the transcript of the relevant portion of the trial, i.e., the court's discussion with counsel regarding their objections after the court concluded its instructions, contains no indication whatsoever that Malaska's trial counsel objected to the court's failure to give a defense of others instruction. Malaska concedes this but points to certain parts of the trial transcript marked by the court reporter as "inaudible" and asserts that the objection was made during one of these exchanges. He contends that, even though defense counsel's objection was not captured by the microphone at trial, the fact that such an objection was made can be gleaned from the context in which the "inaudible" appears in the trial transcript.

The State argues in response that, in such circumstances, Malaska carried the burden to file a motion to supplement or correct the record, and that he failed to take any such corrective action. In the State's view, the record before us fails to indicate that defense counsel objected on the record to the trial court's failure to give a defense of others instruction, and, therefore, Malaska's claim is not properly preserved for appellate review. *See, e.g., Black v. State*, 426 Md. 328, 337 (2012) ("Appellant or petitioner has the burden of producing a sufficient factual record for the appellate court to determine whether error was committed."); *Mora v. State*, 355 Md. 639, 649-50 (1999) ("It is incumbent upon the appellant claiming error to produce a sufficient factual record for the appellate court to determine whether error was committed.").

We agree with the State. While there may be circumstances where an appellate court

29

might conclude that an event occurred or a statement was made at trial even though parts of the trial transcript were inaudible, this is not such a case. Here, the record fails to provide any insight into the subject matter of the inaudible parts of the transcript. The concept of defense of others was not mentioned in Malaska's opening statement, closing argument or, except for Discher's pre-trial statement, throughout the trial. Faced with such uncertainty, it was Malaska's burden to have the record supplemented or corrected. *See* Md. Rules 4-621 and 8-414 (providing means to correct the record at, respectively, the circuit court and appellate court levels).

Malaska failed to file a motion to supplement or correct the record before us and the trial transcript, as it stands, does not contain an objection to the court's failure to give the defense of others instruction. As such, Malaska's contention is not properly preserved for our review.

### 2. Plain Error Review

Malaska asserts, alternatively, that the trial court committed plain error by failing to instruct the jury as to defense of others. Plain error review is a rarely used and tightly circumscribed method by which appellate courts can, at their discretion, address unpreserved errors by a trial court which "vitally affect[] a defendant's right to a fair and impartial trial." *Diggs v. State*, 409 Md. 260, 286 (2009) (quotation marks and citation omitted); *see also Morris v. State*, 153 Md. App. 480, 507 (2003). As Judge Wilner explained in *Chaney v. State*, 397 Md. 460 (2007), plain error review:

30

is a discretion that appellate courts should rarely exercise, as considerations of both fairness and judiciary efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

The Supreme Court summarized the plain error review process in *Puckett v. United States*, 556 U.S. 129,135 (2009):

[P]lain-error review involves four steps, or prongs. First, there must be an error or defect—some sort of [d]eviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [trial] court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

The *Puckett* formulation has been expressly adopted by the Court of Appeals. *See State v. Rich*, 415 Md. 567, 578-79 (2010); *see also Kelly v. State*, 195 Md. App. 403, 432 (2010), *cert. denied*, 417 Md. 502, *cert. denied sub nom. Kelly v. Maryland*, __ U.S. __, 131 S. Ct. 2119 (2011). Moreover, "[i]n the context of erroneous jury instructions . . . the plain error doctrine has been noticed sparingly. The plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." *Peterson v. State*, 196 Md. App. 563, 589 (2010) (citations omitted). We now apply *Puckett* to the facts before us.

The first step of the *Puckett* analysis is satisfied in the present case. Malaska has presented an issue that, conceivably, might lead to a conclusion that the trial court erred and

31

he did not waive the issue at trial. *See, e.g., Carroll v. State*, 202 Md. App. 487, 509 (2011) *aff'd*, 428 Md. 679 (2012) (In the context of plain error review, there is a "difference between forfeiture, which is the failure to make a timely assertion of a right, and waiver, which is the intentional relinquishment or abandonment of a known right. Forfeited rights are reviewable for plain error, while waived rights are not." (Footnote, internal citations and some quotation marks omitted.)). Moving to the second step of the *Puckett* analysis, we do not believe that the error was "clear or obvious" in the context of this case. The trial court provided jury instructions that corresponded with both the State's and Malaska's theories of the case. The State argued that Malaska intentionally shot Liller in retribution for his role in the ongoing Malaska-Spangler property dispute, and Malaska asserted that he shot Liller by accident while acting in self-defense against Michael Spangler. In proper fashion, the trial court instructed the jury as to second degree murder and complete and partial self-defense. Neither the State nor Malaska argued a defense of others theory at trial, nor, other than Discher's out-of-court statement, was there any evidence presented to indicate that Malaska so acted.

Although Malaska argued in his brief that the trial court's "failure to include a defense of others instruction allowed for [him] to be found guilty without giving due consideration to his defense of others claim," the record indicates that Malaska submitted a written defense of others instruction prior to trial but made no further reference to it throughout the remainder of the proceedings. The notion that Malaska, in any meaningful fashion, presented a defense of others defense at his trial is, based on this record, an appellate afterthought and

32

is not a suitable foundation for our exercising our discretion to engage in plain error review.

### III. Invoking the Right to Counsel During an Interrogation

Where, as here, a suspect signs a valid waiver of his *Miranda* rights prior to the commencement of a police interrogation, the suspect must, thereafter, "unambiguously request counsel" in order to invoke his right to counsel. *Davis v. United States*, 512 U.S. 452, 459 (1994). This means that the suspect's request must be a "sufficiently clear articulation, such that a reasonable police officer in the circumstances of [the interrogator] 'would understand the statement to be a request for an attorney.'" *Ballard v. State*, 420 Md. 480, 491 (2011) (quoting *Davis*, 512 U.S. at 459). Malaska argues that, during his interrogation, he made "an express and unambiguous request for counsel." The trial court disagreed, concluding that Malaska had failed to make his request for counsel "unequivocal."

At the beginning of the interrogation, Malaska stated, "maybe I need an attorney." Corporal Martin said in response, "only you can decide that," to which Malaska replied, "possibly I need an attorney." Detective Dixon then stated, "we both know . . . what happened tonight." Malaska responded, "I'll explain what happened." Corporal Martin said in response, "if you want an attorney, no, no other questions will be asked of you." Malaska replied, "No . . . I'd like to make, I'll make a statement" but that, "I think I need an attorney." Corporal Martin attempted to clarify, asking Malaska, "You want an attorney to talk to you before you, you answer any questions?" Malaska responded that, "I'll make a statement right now" and "you can ask me questions." In a further attempt to clarify, Corporal Martin asked

33

Malaska, "You don't want an attorney?" to which Malaska replied, "I don't need an attorney yet. . . ."

Malaska argues that, by stating "I think I need an attorney" in the middle of the interrogation, he sufficiently invoked his right to counsel. Two cases instruct our analysis. The first is *Davis v. United States*. In that case, the suspect signed a valid waiver of his *Miranda* rights before the commencement of an interrogation. An hour and a half into the interrogation, the suspect stated, "[m]aybe I should talk to a lawyer." When asked to clarify his intentions, the suspect replied that he was "not asking for a lawyer" and that "I don't want a lawyer." The interrogation continued until the suspect stated, "I think I want a lawyer before I say anything else," after which all questioning ceased. 512 U.S. at 455. In rejecting the defendant's contention that his first statement—"[m]aybe I should talk to a lawyer"—was sufficient to invoke his right to counsel, the Supreme Court explained:

> [The accused] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [the case law] does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459. In applying this standard, the Court observed that:

> [W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he [or she] gets an attorney if he [or she] wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel.

34

*Id*. at 461; *compare with Mineham v. State*, 147 Md. App. 432, 443-44 (2002) (asking "Should I get a lawyer?" is not a sufficiently clear invocation of the right of counsel); *Matthews v. State*, 106 Md. App. 725, 737-38 (1995) (asking "Where's my lawyer?" is not an effective invocation of the right of counsel).

The second case is *Ballard v. State*. In *Ballard*, the Court of Appeals applied *Davis* to a circumstance where the suspect stated, "You mind if I not say no more and just talk to an attorney about this." The interrogating officer responded by asking, "What benefit is that going to have?" The suspect replied, "I'd feel more comfortable with one." The officer then explained to the suspect that invoking his right to counsel would "kind of cut our ties off somewhat" despite the officer's willingness to "work with you here," and that "if you feel like you want to say any more, which I think it's probably in your best interests to . . . we're going to go back over some of your rights." Thereafter, the officer asked the suspect if he "want[ed] an attorney present with you right now," to which the suspect replied, "I don't need no attorney." 420 Md. at 485.

In concluding that the defendant's statement was a sufficiently clear invocation of his right to counsel, the Court distinguished the defendant's statement from those in *Davis* and its progeny, explaining:

> The questions "Maybe I should talk to a lawyer," and "Should I get a lawyer" suggest that the suspect *might* want a lawyer, which, under *Davis*, is insufficient to require the officer to cease questioning.

*Id*. at 492. In contrast:

> A speaker who begins a statement with the phrase "you mind if . . ." suggests to his or her audience that the speaker is about to express a desire, whether to do something or have something occur. The phrase "you mind if . . ." in this context is a colloquialism; it is reasonably assumed that the speaker is not actually seeking permission to do the thing desired or to have the desired thing occur.

*Id*. at 492-93. The Court further observed that, even if the defendant's "you mind if. . ." statement was deemed ambiguous or equivocal, his second statement—"I'd feel more comfortable with one" clarified that he desired an attorney. *Id*. at 494.

In the instant case, Malaska's statements at the beginning of the interrogation—that he "maybe" and "possibly" needed an attorney—are equivocal, and, thus, insufficient to invoke his right to counsel under *Davis* and *Ballard*. After Malaska made the equivocal statements, Corporal Martin inquired into the matter further, as recommended by the Court in *Davis*, in an attempt to clarify Malaska's intentions. Malaska, however, provided conflicting answers to Corporal Martin's questions. Malaska replied, "I'll make a statement" but that "I think I need an attorney." Malaska focuses his argument on the second part of his answer—"I think I need an attorney"—and contends that this statement is a sufficient articulation of Malaska's right to counsel, such that the interrogation should have ceased until Malaska obtained counsel. We disagree. In our view, when an officer properly inquires into the intentions of a suspect and receives an answer with two directly conflicting sub-parts, it is proper, as was done here, for the interrogating officer to inquire further into the matter in order to clarify the suspect's intentions. *Compare with Davis*, 512 U.S. at 461. Here, upon further inquiry, Malaska made it clear that he wanted to give a statement, and that he did not

36

need an attorney "yet." A reasonable officer on these facts would not have understood

Malaska's statements to be clear, unambiguous, or unequivocal invocations of his right to

counsel. The trial court did not err in denying Malaska's motion to suppress.


**THE JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**