**HEADNOTE:** *Richard L. Blanks v. State*, **No. 1050, September 2015 Term**
**SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES - - *CRAWFORD V. WASHINGTON*, 541 U.S. 36 (2004) - - PROBATION VIOLATION HEARING - - CONFRONTATION RIGHT UNDER DUE PROCESS CLAUSE OF FOURTEENTH AMENDMENT.**

       Under the Sixth Amendment, an accused in a criminal proceeding has the right to confront witnesses against him. A probation violation hearing is a civil, not a criminal, proceeding, and therefore the Sixth Amendment Confrontation Clause does not apply. Probationers have a right to confront witnesses in a violation proceeding, however, pursuant to the Due Process Clause of the Fourteenth Amendment. That right is not co-extensive with the Sixth Amendment confrontation right. The Supreme Court's holding in *Crawford* and its progeny that under the Confrontation Clause of the Sixth Amendment testimonial hearsay is not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him does not apply to probation violation proceedings. The due process right to confrontation was satisfied in this case.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1050

SEPTEMBER TERM, 2015

_____

RICHARD L. BLANKS


v.


STATE OF MARYLAND

_____

Eyler, Deborah S.,
Woodward,
Berger,


                    JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: June 2, 2016

This case raises the question whether the Sixth Amendment right to confront witnesses, as interpreted by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), applies in a probation revocation hearing. We hold that it does not. We further hold that the right to confront witnesses as protected by the Due Process Clause of the Fourteenth Amendment does apply and was satisfied in this case.

On November 14, 2011, in the Circuit Court for Dorchester County, Richard Blanks, the appellant, entered an *Alford* plea to a charge of robbery.[1] The court sentenced him to 15 years' incarceration, with all but 279 days suspended, and imposed a 5-year period of supervised probation.

As relevant here, over two years later, on March 20, 2014, Blanks admitted to having violated his probation by possessing drug paraphernalia (a crime for which he had been charged and convicted in the District Court). His probation was revoked and he was sentenced to serve his suspended sentence of 14 years and 86 days,[2] with all but the 218 days (time served) suspended. The court imposed a new five-year term of probation. The probation order required Blanks to comply with "All Standard Conditions," which included reporting "as directed" to his supervising parole and probation agent (condition 1) and not using any controlled dangerous substances (condition 8). Under the "Special

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

[2] Blanks notes that the court failed to credit him for 99 days served while awaiting a prior violation of probation hearing in June of 2012. He does not challenge his sentence as illegal in the instant appeal, however.

Conditions" section of the probation order, Blanks was ordered to "[t]otally abstain from alcohol, illegal substances, and abusive use of any prescription drug" (condition 16).

Travis Knapp, an agent with the Maryland Division of Parole and Probation ("P&P"), was assigned to supervise Blanks's probation. He directed Blanks to report to the Cambridge P&P Office for a face-to-face meeting twice a week and, in addition, to either call or use a kiosk machine to report once per week. Blanks was required to submit to drug testing twice a week and was referred to an addictions counseling program.

On January 27, 2015, during an in-person visit at the P&P Office, Knapp directed Blanks to provide a urine sample for random drug testing. John Cannon, an agent assistant with P&P, watched Blanks urinate into a sampling container. Blanks closed the container and followed Cannon into his office. There, Blanks initialed an adhesive tamper-proof seal marked with a specimen number. Cannon placed the seal on the top of the lid of the sampling container and directed Blanks to press the seal tightly around the edges of the lid. Cannon held open a plastic bag and Blanks placed the sealed container inside the bag.

Cannon completed a chain of custody form for the sample. He verified that the form included the same specimen number as the seal on the container. Blanks and Cannon both signed and dated the chain of custody form. Cannon put the chain of custody form in the plastic bag with the sampling container and sealed the bag. Cannon dropped the plastic bag in a UPS drop box for delivery to Phamatech Inc. ("Phamatech"), a laboratory in San Diego, California.

Six days later, on February 3, 2015, Knapp received a report from Phamatech stating that Blanks's January 27, 2015 urine sample had tested positive for the presence of marijuana. The next day, Knapp requested that a warrant be issued for Blanks's arrest for violation of conditions 8 and 16 of his probation pertaining to the use of drugs or alcohol.

On February 11, 2015, Blanks called Knapp and asked him why there was an active warrant for his arrest. Knapp advised Blanks of the positive urinalysis result. He directed Blanks to come to the P&P Office that day or the following day, February 12, 2015. Blanks asked Knapp if "it would be . . . an additional violation" if he did not come in. Knapp replied that it would be. Blanks did not report to the P&P Office that day or the next day. He eventually turned himself in on February 18, 2015. The next day, Knapp filed in the circuit court a "Supplemental Report" adding a charge for violating condition 1, alleging that Blanks failed to report as directed on February 12, 2015.

On May 21, 2015, the circuit court held a probation revocation hearing. The State called three witnesses: Knapp, Cannon, and Ken Kodama, Phamatech's laboratory director. Knapp and Cannon testified about the facts as we have recounted them. During Cannon's testimony, the State introduced into evidence the chain of custody form. In his case, Blanks recalled Knapp.

Kodama testified that he holds a B.S. degree and, at the time of the hearing, had worked in the field of toxicology for twenty-nine years and had been the director of the laboratory at Phamatech for thirteen years. Without objection, he was accepted by the court as an expert in toxicology and in urinalysis testing for the presence of controlled

3

dangerous substances ("CDS"). Kodama explained that Blanks's urine was twice screened for marijuana using the enzyme multiple immunoassay technique ("EMIT"). It tested positive both times. It then was retested using the gas chromatograph-mass spectrometry ("GCMS") technique, which also yielded a positive result. Over Blanks's objection, a February 2, 2015 Phamatech report ("Exhibit 2") reflecting the EMIT urinalysis test results, and including a certification of accuracy for the two EMIT tests and the GCMS test, signed by Kodama, was admitted into evidence.

At the conclusion of the hearing, the court found that Blanks had violated his probation by 1) failing to report to Knapp at the P&P Office by the close of business on February 12, 2015, and 2) using marijuana. The court revoked Blanks's probation and ordered him to serve the remaining portion of his suspended sentence – 13 years, 7 months, and 20 days – with the commencement date of his sentence backdated to February 18, 2015, to give him credit for time served.

Blanks filed an application for leave to appeal, which this Court granted by order of September 8, 2015. He presents two questions for review, which we have rephrased as follows:

> I. Did the circuit court violate Blanks's confrontation rights by admitting Exhibit 2 into evidence?

> II. Did the circuit court err by finding that Blanks violated his probation by failing to report to his probation agent by the close of business on February 12, 2015, as directed?

4

## Admission of Exhibit 2

### (a)

Exhibit 2 is a one-page laboratory report. Its header gives Phamatech's name and address. Below the header is a section with the following information: the "Agent/Monitor" (Knapp); the "Agency" (P&P); the "Collection Site" (Off 61)[3]; the "Division Number" (0170042A); the "Client" (Maryland P&P – Cambridge Field Office); and the "Collector" (Cannon). It is apparent that this information was drawn from the chain of custody form Cannon prepared.

The next section of Exhibit 2 is titled "Sample Information." It includes Blanks's name, sex, and SID number; the "Specimen ID" assigned to his urine sample by Phamatech; the ID number assigned to the "Lab Sample" drawn from his urine sample; the type of sample (*i.e.*, urine); the date and time the urine sample was collected at the P&P Office; the date and time the urine sample was received by Phamatech; and the date and time the Phamatech report was issued.

The test results for the sample are set out in a table in Exhibit 2. The column labeled "Test" shows that Blanks's urine sample was subjected to an "EMIT SCREEN" for benzodiazepines, cocaine, opiates, and marijuana; a creatinine levels test; and a "MARIJUANA EMIT RE-SCREEN." The "Result" column reflects "POSITIVE"

---

[3] We presume that "Off 61" is a numerical identifier for the Cambridge P&P Office.

results for the two EMIT marijuana tests, negative results for the EMIT for the other drugs, and an "ABNORMAL" creatinine level.[4] A column labeled "Quantitation"[5] is blank for the marijuana tests, as are columns labeled "Screen Limit" and "GCMS Limit."

The bottom section of Exhibit 2, entitled "CERTIFICATION OF ANALYSIS," reads:

> This is to certify that Phamatech to include its facilities, personnel, and procedures, is certified by the Maryland Department of Health and Mental Hygiene – Office of Health Care Quality (DHMH-OHCQ) and has been approved by the Maryland Department of Public Safety and Correctional Services to perform laboratory tests.
>
> The undersigned chemist or analyst certifies that he or she is qualified, under standards approved by [DHMH-OHCQ], to perform the laboratory test. The undersigned certifies that the above-named donor's specimen was received by the undersigned and was properly tested by him or her under procedures and equipment approved by the [DHMH-OHCQ]. The undersigned further certifies that the procedures of the laboratory are reliable.
>
> The undersign [sic] certifies that a positive laboratory test indicated above and confirmed by GC/MS indicates that the above named donor used a controlled dangerous substance[.]

The certification was signed by Kodama on February 2, 2015.

At the probation revocation hearing, Kodama testified that he oversees the Phamatech laboratory, which handles approximately 4,000 urine samples each day. He

---

[4] A creatinine test measures kidney function. *See Dorland's Illustrated Medical Dictionary* 429 (32nd ed. 2012). An abnormally low creatinine level can be evidence that the donor of the urine sample consumed excessive amounts of water before submitting the urine sample in an attempt to dilute the sample and avoid a positive drug test.

[5] "Quantitation" is the measurement of the quantity of something. *See Webster's Third New International Dictionary* 1859 (2002).

6

supervises the entire laboratory and reviews every positive test result. (Negative test results are not reviewed.) Urine samples are processed and analyzed at Phamatech using an "assembly line" system, with different employees in different divisions performing the individual steps. Each urine sample is received in the laboratory, logged into the computer, and cross-checked to ensure that the sample and the chain of custody form both bear the same specimen number and that the seal on the sample has not been broken.[6] Phamatech assigns its own unique identifier to each sample.

The testing begins with a lab technician breaking the seal, extracting a small amount of urine from the specimen container, and transferring it to a test tube labeled with a barcode bearing Phamatech's unique identifier. The remainder of the sample is placed in frozen storage. Another lab technician puts the test tube in a machine known as an analyzer. The actual EMIT testing is automated, *i.e.,* is performed by the analyzer, not by a person. The analyzer prints out data from the test. If the initial test result is positive, another small amount of urine is extracted from the specimen container and a second, confirmatory EMIT test is performed on it. Between each sampling test, the analyzer goes through an automated wash cycle that uses three solvents to prevent cross-contamination. And between each batch of samples, control samples are run through the analyzer to ensure that it has been properly calibrated.

Kodama testified that a specimen from Blanks's urine sample was first tested in the analyzer using the EMIT test for benzodiazepines, cocaine, opiates, and marijuana.

---

[6] Phamatech rejects urine samples with torn seals or mismatched specimen numbers.

7

That test is the "standard in the forensic drug testing business." The EMIT test produced a "positive" finding for the presence of marijuana (and negative for the other substances). A second EMIT test was performed and also produced a positive test result for marijuana. After the two positive EMIT test results for marijuana, another small amount of urine was extracted from Blanks's specimen container and was tested for marijuana using GCMS.[7] Kodama "pulled off the data" for the results of the "marijuana confirmation test from the [GCMS] analyzer" and reviewed them. He then certified that the test results were positive for the presence of marijuana.

At the conclusion of Kodama's testimony, the State moved for the admission of Exhibit 2. Blanks's attorney objected, stating:

> [DEFENSE COUNSEL]: [T]he information [on Exhibit 2 in the "Sample Information" section] is information that someone else imprinted into this sample[;] that's not a Pharmatech [sic] record about the sample. I would object to that based on hearsay.
> **For the information [on Exhibit 2 in the "Test" section,"] I would object based on confrontation rights** and chain of custody. We know and we have a fair amount of testimony about what went on to get the sample in the box. That was a pretty clear step by step process. **Then about Mr. Blanks [sic] specific sample we know virtually nothing else except Mr. Kodama received a printout that had this information on it that he interpreted.**

---

[7] Kodama testified that the GCMS test takes about four hours to complete. The urine sample is "taken through . . . an extraction process" that purifies and concentrates certain compounds in the urine. After that process is finished, the sample is placed in the "G.C.M.S. Analyzer" to test for the presence of a marijuana compound, which he characterized as its "fingerprint pattern."

Kodama stated that Phamatech issued "another report" reflecting the GCMS test results and that he believed the State had that report as well. As mentioned, Exhibit 2 reflects that Blanks's urine sample was subjected to an "EMIT SCREEN" and an "EMIT RE-SCREEN."

THE COURT: Well, that's not exactly true. You've got barcoding and numbers all along the way to make sure that the sample that purports to be Mr. Blanks' [sample] is the one that's being reviewed by the scientist.

[DEFENSE COUNSEL]: That other people added on to the sample, that other people inputted into the system. That other – you know, he testified about the general procedure. **He didn't testify about [what] someone specifically did to Mr. Blanks' specific sample.**

THE COURT: The law is clear that a supervisor can testify as to –

[DEFENSE COUNSEL]: The –

THE COURT: I understand you're making an objection but I want you to know the law is clear on that.

[DEFENSE COUNSEL]: I understand.

THE COURT: It would be highly impractical to be able to do otherwise.

[DEFENSE COUNSEL]: **As far as confrontation rights, Your Honor, there has been a lot of different developments and people are still trying really to work out how [*Crawford v. Washington*] applies to laboratory testing.** That's still in development. **But I think at minimum there should be someone who at least handled the sample. Didn't just get a printout of the test for confrontation purposes and interpreted the results.** And I'm not – for purposes of this hearing I'm not disputing Mr. Kodama's expertise in that area, but he's not the one – **the confrontation is more than about just the data it's how you get to the data. And there is very little about Mr. Blanks' specific sample and people who actually handled the sample for this hearing.** So I would reserve – I know that under [*State v. Fuller*, 308 Md. 547 (1987)] confrontation does have some application even to V.O.P.'s which is why we are all here today. I would object to that result on that basis.

THE COURT: All right. Maybe this can be your test case. [Exhibit] 2 is admitted.

(Emphasis added.) At the close of the hearing, defense counsel argued that the

evidence was legally insufficient to prove that Blanks had violated his probation by using

marijuana. He pointed out that Exhibit 2 has no information in the "Quantitation" or

"Screen Limit" columns for the marijuana tests, and Kodama did not testify about what concentration of marijuana in the urine is necessary to produce a positive reading. Defense counsel suggested that it was possible that Blanks merely inhaled "secondary [marijuana] smoke." He argued that "the simple fact of a positive with nothing more does not show that Mr. Blanks willfully used marijuana in violation of probation."

The court ruled as follows:

[T]he Court is impressed with the quality assurance connected with the collection of the sample and the testing process and experienced Probation Agent such as Mr. Cannon supervises the test. The protocol is in place. It appeared to assure that there is no mixup regarding urine.
    The testimony from [Kodama] indicates that they conduct a lab that has a series of checks and balances to make sure there is not a false positive or the samples are mixed up. He also indicates they have controls in place that involve cleaning the machines. There are barcodes to make sure the samples are consistent. And there is a retesting procedure if there is a positive.
    Given all the evidence that the Court has received the Court is convinced by a preponderance of the evidence that Mr. Blanks did have marijuana in his system therefore he was possessing marijuana in his system and that that would be a violation of both [condition] 8 and [condition] 16 which require him to totally abstain. And for those reasons the Court is convinced that he has violated probation.

**(b)**

Relying upon *Crawford v. Washington*, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, __ U.S. ___, 131 S.Ct. 2705 (2011), Blanks contends the trial court erred by admitting Exhibit 2 because doing so violated his confrontation rights under the Sixth Amendment to the federal constitution.[8] He

---

[8] Blanks also bases his argument on Article 21 of the Maryland Declaration of Rights. The confrontation rights in Article 21 have been read "as generally providing the
(Continued…)

maintains that Kodama was a "surrogate or conduit witness for another person at Phamatech who actually received and reviewed the results of the EMIT test and then made the statements in the report that a sample of [Blanks]'s urine was subjected to a Marijuana EMIT Screen." According to Blanks, the out-of-court statements in Exhibit 2 are testimonial hearsay that was not admissible through Kodama, under controlling Sixth Amendment case law. Consequently, the court erred by admitting Exhibit 2 and by relying on the test results documented by Exhibit 2 to find that he violated his probation by using marijuana.

The State responds that Blanks did not have a Sixth Amendment confrontation right at his probation revocation hearing, and therefore *Crawford* and its progeny did not apply. According to the State, Blanks had a right to confront witnesses at the probation revocation hearing, but that right was grounded in the Due Process Clause of the Fourteenth Amendment and "is not co-extensive with the Sixth Amendment [confrontation] right." The State maintains that the due process confrontation right was not violated because Exhibit 2 was a business record, admissible under the hearsay exception in Rule 5-803(b)(5); it contained information that Kodama relied upon in forming his expert opinion, making it admissible under Rule 5-703; and, as the court implicitly found, the information in Exhibit 2 was reliable and there was good cause to admit it without additional live testimony.

---

(…continued)
same protection to defendants." *Derr v. State*, 434 Md. 88, 103 (2013). Blanks does not argue that Article 21 offers broader confrontation protections than the Sixth Amendment.

In his reply brief, Blanks argues that, in *State v. Fuller*, 308 Md. at 547, the Court of Appeals recognized that the Sixth Amendment right to confrontation applies in probation revocation hearings in Maryland, and that remains the law today. He maintains that even if that is not the case and only the due process confrontation right applies, the court's admission of Exhibit 2 violated that right.

**(c)**

The Sixth Amendment guarantees an array of rights to "the accused" "[i]n all criminal prosecutions." One such right is "to be confronted with the witnesses against him."

During the *Ohio v. Roberts's* era of Sixth Amendment Confrontation Clause jurisprudence, an out-of-court statement by an unavailable declarant was admissible against the defendant in a criminal prosecution if the statement bore "adequate 'indicia of reliability.'" 448 U.S. 56, 66 (1980). Hearsay could meet that test if it came within a "firmly rooted hearsay exception" or carried "particularized guarantees of trustworthiness." *Id*.

In *Crawford v. Washington*, the Supreme Court overruled *Roberts*, holding that, unless the declarant of the out-of-court statement is unavailable *and* the defendant had a prior opportunity to cross-examine him, it is a violation of the defendant's Sixth Amendment confrontation right to admit "testimonial" hearsay. 541 U.S. at 68. The Court did not "articulate a comprehensive definition," *id.* at 68 n.10, of "testimonial hearsay" but suggested that it would include

12

extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52.

In subsequent cases, the Supreme Court has made plain that a forensic laboratory report, such as Exhibit 2, is "testimonial" hearsay that must meet the *Crawford* standard for admission in evidence in a trial in a criminal prosecution. *See Melendez-Diaz*, 557 U.S. at 308-11 ("'certificates of analysis' showing the results of the forensic analysis performed" of a powdered substance determined to be cocaine were "testimonial" and were improperly admitted at trial without the live testimony of the analysts); *Bullcoming*, __ U.S. __, 131 S.Ct. at 2710, 2713 (a forensic laboratory report certifying that the defendant's blood contained a specified concentration of alcohol was not admissible through the testimony of a laboratory analyst who had "not sign[ed] the certification or personally perform[ed] or observe[d] the performance of the test reported in the certification."

A revocation of probation hearing is a civil proceeding, not a criminal prosecution. In *Morrissey v. Brewer*, 408 U.S. 471, 480-82 (1972), the Supreme Court held that because parole revocation proceedings are civil the rights afforded an accused under the Sixth Amendment do not apply. A year later, in *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973), the Court applied its holding in *Morrissey* to revocation of probation proceedings.

In the twelve years since *Crawford* was decided, ten federal courts of appeals have addressed whether the *Crawford* standard for admissibility of testimonial hearsay applies

13

in a revocation of probation (or parole) proceeding. All ten courts have held that because the rights guaranteed by the Sixth Amendment only apply to "criminal prosecutions," neither the Sixth Amendment right to confrontation nor the *Crawford* Court's interpretation of that right applies in such a proceeding. *See United States v. Rondeau*, 430 F.3d 44, 47 (1st Cir. 2005) ("Nothing in *Crawford* indicates that the Supreme Court intended to extend the Confrontation Clause's reach beyond the criminal prosecution context"); *United States v. Aspinall*, 389 F.3d 332, 343 (2nd Cir. 2004) ("Nothing in *Crawford*, which reviewed a criminal trial, purported to alter the standards set by *Morrissey*/*[Gagnon]* or otherwise suggested that the Confrontation Clause principle enunciated in *Crawford* is applicable to probation revocation proceedings"); *United States v. Lloyd*, 566 F.3d 341, 343 (3rd Cir. 2009) ("The limited right to confrontation [afforded in a revocation proceeding] stems from the Fifth Amendment's Due Process Clause, not from the Confrontation Clause of the Sixth Amendment."); *United States v. Ferguson,* 752 F.3d 613, 619 (4th Cir. 2014) (revocation of parole proceeding "does not involve the Sixth Amendment")[9]; *United States v. Kirby*, 418 F.3d 621, 627 (6th Cir.

---

[9] In *Ferguson*, a laboratory tested a substance found in the possession of a parolee, Ferguson, and issued a report stating that the substance was marijuana. The report listed the name of an analyst. The report did not state on its face the type of test performed, the analyst's background or experience, "confidence intervals," "the measurement instruments used," or whether a "proper chain of custody" was followed. 752 F.3d at 616. At the parole revocation hearing, the government made no showing that the analyst was unable to testify. The report was introduced during the testimony of a police officer who had stopped Ferguson and confiscated the substance later identified as marijuana. The court emphasized that Ferguson had been completely stripped of his confrontation rights at the hearing. While recognizing that Ferguson did not possess a Sixth Amendment confrontation right at his hearing, the court reasoned, based on *Crawford*, that the report's

(Continued…)

14

2005) (*Crawford* does not apply to a revocation of probation proceeding because, by its text, the Sixth Amendment does not apply outside of a criminal prosecution); *United States v. Kelley*, 446 F.3d 688, 691 (7ᵗʰ Cir. 2006) ("*Crawford* changed nothing with respect to [probation] revocation hearings" because the "limited confrontation right in revocation proceedings was explicitly grounded in considerations of due process, not the Sixth Amendment"); *United States v. Ray*, 530 F.3d 666, 668 (8th Cir. 2008) (*Crawford* does not apply in the context of a revocation of supervised release proceeding); *United States v. Hall*, 419 F.3d 980, 985 (9ᵗʰ Cir. 2005), *cert denied*, 546 U.S. 1080 (2005) (*Crawford* does not apply in a revocation of probation proceeding where "due process standard[s] [are] used to determine whether hearsay evidence" is admissible); *Curtis v. Chester*, 626 F.3d 540, 544 (10th Cir. 2010) (Sixth Amendment right to confrontation does not apply in parole revocation proceeding and "neither do any Supreme Court cases dealing with it, specifically *Crawford*"); *Ash v. Reilly*, 431 F.3d 826, 829 (D.C. Cir. 2005) (due process rights afforded to a parolee at a revocation proceeding emanate from the Due Process Clause of the Fourteenth Amendment, not the Confrontation Clause of the Sixth Amendment, thus making *Crawford* inapplicable in that setting). *See also Reyes v. State*, 868 N.E.2d 438, 440 & n.1 (Ind. 2007) (holding that *Crawford* has no application in a civil revocation of probation proceeding); *State v. Carr*, 167 P.3d 131, 134 (Ariz.

---

(…continued)
reliability could not be properly tested absent the crucible of cross-examination, and that the circuit court had erred by admitting it.

App. 2007) (probation revocation proceeding is not "a stage of a criminal prosecution" and thus does not implicate the Sixth Amendment).

**(d)**

In *Morrissey*, after holding that Sixth Amendment rights do not apply in a parole revocation proceeding, the Supreme Court went on to decide whether "the requirements of due process in general apply to parole revocations." 408 U.S. at 481. In doing so, it took into account the interests of the parolee and the State. "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* at 480. Nevertheless, the parolee's liberty interest "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* at 482. That liberty interest "is valuable and must be seen as within the protection of the Fourteenth Amendment"; and "[i]ts termination calls for some orderly process, however informal." *Id.*

On the other hand, the Court observed, "[g]iven the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." *Id.* at 483. "Yet, the State has no interest in revoking parole without some informal procedural guarantees." *Id.*

Assessment of the competing interests of the parties lead the Court to conclude that a parolee faced with revocation is entitled to basic due process procedural

16

protections, including the opportunity for a revocation hearing that "must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Id.* at 488. The "minimum requirements of due process" include:

> (a) written notice of the claimed violation of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) *the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)*; . . . and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489 (emphasis added). The procedures to be followed to implement these minimum due process rights are "the responsibility of each State" to adopt, by legislation or judicial decision. *Id.* at 488. The Court made clear that these minimum requirements of due process are not on an equal footing with the procedural guarantees afforded by the Sixth Amendment:

> *We emphasize that there is no thought to equate this [hearing] stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in a criminal trial.*

*Id.* at 489 (emphasis added). As we have noted, in *Gagnon* the Supreme Court extended its holding in *Morrissey* to probation revocation hearings.

Beginning with *State v. Fuller*, 308 Md. 547, and as fleshed out in *Bailey v. State*, 327 Md. 689 (1992), the Court of Appeals adopted a two-part test for the admissibility of hearsay offered at a probation revocation proceeding that would be in keeping with the

17

limited confrontation right recognized in *Morrissey/Gagnon*. Although drawn from the standard that once prevailed in criminal prosecutions under *Ohio v. Roberts*, the test differs from that standard in significant respects. The hearsay evidence is "tested against the formal rules of evidence to determine whether it fits any of the 'firmly rooted' exceptions to the hearsay rule." *Bailey,* 327 Md. at 698. If so, it will be admitted. If not, the court may admit it upon finding that "it is 'reasonably reliable' *and* . . . that there is good cause for its admission." *Id.* at 699 (citing *Fuller*, 308 Md. at 553) (emphasis added). "[G]ood cause need not reach the high standard governing the admissibility of hearsay evidence at criminal trials." *Fuller*, 308 Md. at 553 n.5. "In determining whether there is good cause to admit hearsay in a probation revocation hearing, it is obvious that the most important factor is the reliability of the proffered hearsay evidence" and "whenever the proffered hearsay evidence has substantial guarantees of trustworthiness the hearsay is admissible without the need to establish any additional good cause." *Bailey,* 327 Md. at 699 (citing *Egerstaffer v. Israel*, 726 F.2d 1231, 1234-35 (7th Cir. 1984)).

In *Fuller*, the Court of Appeals applied this two-part test to hold that the court in a probation violation hearing erred by permitting a police officer to testify about out-of-court statements made by witnesses during a criminal investigation. The investigation pertained to a charge against the probationer, Fuller, for uttering a bad check to a car dealership. The charge was placed on the stet docket, but the facts underlying it were the basis for Fuller's being charged with violating his probation in two cases. The Court concluded that because the hearsay statements did not come within any recognized

18

exception to the hearsay rule and the court did not make a finding of "good cause for disallowing confrontation" the statements were not admissible. 308 Md. at 554.

Five years later, in *Bailey*, the Court of Appeals held that a letter from the probationer's substance abuse treatment program stating that he had not completed the program was admissible without the testimony of its author because the letter was "sufficiently reliable to satisfy both evidentiary and constitutional requirements when admitted for the limited purpose of showing that Bailey did not complete the [substance abuse treatment program]." 327 Md. at 700. Noting that the "reliability" inquiry is "fact specific," the Court emphasized that a reliability finding is reviewed for abuse of discretion. *Id*. Factors relevant to assessing reliability include "the presence of any additional evidence which corroborates the proffered hearsay; the type of and centrality of the issue that the hearsay is being offered to prove; and the source of the hearsay, including the possibility of bias or motive to fabricate." *Id*. With respect to the latter factor, the Court noted that the "source of the proffered hearsay" could "bolster[] its reliability." *Id*. at 703.

The Court held that the letter was admissible as inherently reliable hearsay. It emphasized that the substance of the letter was corroborated by Bailey's own statement to his probation agent; the condition Bailey was alleged to have violated was "straightforward"; the letter was admitted to prove a simple, objective fact; and the "source of the hearsay statement [was] a reliable one." *Id*. at 704-05. Moreover, the Court observed, "good cause to admit the letter was apparent from the record." *Id*. at 705. This was so even though there had been no showing that the author of the letter was

19

unavailable. The Court opined that "the same reasons that an author of a business record need not be shown to be unavailable (*i.e.*, inconvenience, probable lack of recollection of a routine business event, etc.)" supported a finding of good cause to admit the letter. *Id.* at 706. The Court did not reach the question whether the letter qualified as a business record under the business record exception to the rule against hearsay.[10]

**(e)**

We have no problem concluding, as all ten federal courts of appeals have concluded, that the Sixth Amendment does not apply to probation revocation proceedings and therefore the Confrontation Clause of the Sixth Amendment, as interpreted by the Supreme Court in *Crawford* and its progeny, does not apply. That conclusion naturally flows from the *Morrissey/Gagnon* holdings that probation revocation proceedings are

---

[10] More recently, in *Thompson v. State*, 156 Md. App. 238 (2004), this Court applied the two-part test in deciding whether the trial court erred in allowing the State to introduce, at a revocation of probation proceeding, transcripts of the testimony of witnesses at the probationer's murder trial. Thompson had been acquitted of murder, but the State had charged him with violating his probation based on the same underlying facts. Specifically, at the probation revocation hearing, the State sought to prove, under the lower preponderance of the evidence standard, that Thompson had violated his probation by committing the murder.

On appeal from an order revoking Thompson's probation, we vacated and remanded for further proceedings. Under the first prong of the test, we held that the transcripts were not admissible under the "prior testimony" hearsay exception, *see* Rule 5-804(b)(1), because the State had not made any showing that the witnesses were unavailable. *Id.* at 250. Under the second prong, we held that the court did not make any finding as to whether the transcripts were reasonably reliable and whether there was good cause to dispense with live testimony. Accordingly, we remanded the case to the circuit court to make the necessary findings. *Id.* at 252.

civil, and the Sixth Amendment only applies to criminal prosecutions. Nothing about *Crawford* affected those holdings. [11]

As noted, Blanks seizes upon language in *Fuller* to argue that, in Maryland, the Sixth Amendment right to confront witnesses applies in probation revocation hearings. In the opening paragraph in *Fuller*, the Court of Appeals stated, "We shall hold here that a respondent in a probation revocation hearing enjoys the right of confrontation of witnesses guaranteed to defendants in criminal proceedings, unless the State demonstrates good cause for dispensing with confrontation, and the trial judge makes a specific finding of good cause stated in the record of the revocation proceeding." 308 Md. at 549. Most of the opinion is devoted to a discussion of *Morrissey* and *Gagnon*, however, beginning with the statement, "The Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes procedural and substantive limits on the revocation of the conditional liberty created by probation," *id.,* at 552, and continuing that "[f]air process" in a probation revocation hearing includes "'"*the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation*)."'" *Id.* (quoting *Gagnon*, 411 U.S. at 786, in turn quoting *Morrissey*, 408 U.S. at 489) (emphasis supplied in *Fuller*).

Given the *Fuller* Court's express reliance upon *Morrissey* and *Gagnon*, in which the Supreme Court made plain that Sixth Amendment rights do not apply to revocation

---

[11] Accordingly, Blanks's reliance upon this Court's decisions in *Norton v. State*, 217 Md. App. 388 (2014), and *Malaska v. State*, 216 Md. App. 492 (2014), both of which apply the *Crawford* standard in criminal proceedings, is misplaced.

proceedings, and the Court's application of the *Morrissey/Gagnon* holdings, it is not reasonable to read *Fuller* for the proposition that the Sixth Amendment Confrontation Clause applies to probation revocation hearings.

Five years later, in *Bailey*, the Court, citing *Morrissey* and *Gagnon*, stated that "because probation revocation is not a stage of the criminal process, the full panoply of rights due a defendant in a criminal prosecution is not required at a probation revocation hearing." 327 Md. at 698. "[A] probationer is entitled to due process at such a hearing," however, *id.,* and

> we recognized in [*Fuller*] that there is some right of confrontation, pursuant to the Sixth Amendment . . . , which is guaranteed to a probationer at a probation revocation hearing. *The right of confrontation at a probation revocation hearing differs, however, from the right of confrontation at a criminal trial* and some hearsay may be admitted in a revocation hearing.

*Id.* Like *Fuller,* we do not read *Bailey* as holding that the Sixth Amendment applies to probation revocation hearings such that *Crawford* and its progeny would apply.[12]

Blanks suggests that even if the Sixth Amendment does not apply to probation revocation proceedings, given that the Court of Appeals referenced it in *Fuller* and *Bailey*, this Court should apply a heightened standard for admission of hearsay in such

---

[12] We note that, in *Hersch v. State*, 317 Md. 200, 208 (1989), the Court of Appeals observed that under the Due Process Clause of the Fourteenth Amendment a probationer is entitled to several basic rights, including the right to confront witnesses; and that right, although "not quite as broad as that afforded a defendant in a criminal proceeding," "remains a valuable and fundamental right." The Court cited *Fuller*, but made no mention of the Sixth Amendment.

22

proceedings that incorporates the heightened standard adopted by the Supreme Court in *Crawford*. We disagree.

The holding in *Crawford* rests entirely upon the Supreme Court's analysis of the history underlying the Framers' inclusion of the Confrontation Clause in the Sixth Amendment and the purposes they sought to accomplish in doing so. That history and those purposes related solely to the condemned practice of "civil-law examination," by which prosecutors used testimony obtained out of court at the trial of a criminal defendant when the defendant could not confront and cross-examine the declarant to challenge the testimony. Justice Scalia, writing for the Court, detailed how, before the Revolution, the law of England was changed to adopt a confrontation right that did away with "civil-law examination" in criminal prosecutions. The Confrontation Clause was intended to protect the accused in a criminal prosecution in the same way.

The rationale underlying the Sixth Amendment Confrontation Clause is tied to criminal prosecutions and has nothing to do with the use of hearsay evidence in civil matters. The holdings in *Morrissey* and *Gagnon* were unchanged by *Crawford*, and there is no reason to extend the *Crawford* analysis to probation violation proceedings that do not concern an accused's right to be tried and convicted only with the fair opportunity to confront the witnesses against him by means of cross-examination.

**(f)**

We turn to whether Exhibit 2 was properly introduced into evidence under the less stringent due process confrontation standard for admitting hearsay in a probation revocation proceeding.[13]

The State amply established the reliability of the test results set forth in Exhibit 2. It presented live testimony from two witnesses – Cannon and Kodama – detailing the collection and analysis of Blanks's urine sample. Based on that testimony, the court found that there were extensive checks and balances at the P&P Office and at Phamatech to ensure that each urine sample was properly linked to its donor, to prevent cross-contamination, and to prevent false positives.[14] It further found that there was an

_____

[13] The State contends this issue is not preserved for review. We disagree. At the hearing, Blanks's lawyer objected to the admission of Exhibit 2 "based on confrontation rights," citing *Fuller*, which, as we have discussed, concerns the more limited confrontation right afforded to probationers. The State does not dispute that Blanks had confrontation rights at his probation revocation hearing that stem from the Due Process Clause of the Fourteenth Amendment. His objection below adequately preserved the question whether Exhibit 2 was admissible under the strict *Crawford* standard **or** under the less stringent standard for admission of "reliable" hearsay under due process principles.

[14] In his reply brief, Blanks points out for the first time that the chain of custody form includes a section at the bottom that, he asserts, should have been, but was not, completed by a Phamatech employee. That section states that it is to be "INITIATED BY COLLECTOR [*i.e.*, P&P] AND COMPLETED BY LABORATORY [*i.e.* Phamatech]." In this section, Cannon printed his name, signed his name, and specified the date and time that he "released" the specimen bottle to UPS.

Below Cannon's signature is a box labeled "RECEIVED AT LAB," which has a space for the "Accessioner" at the laboratory to print and sign his name and specify the date that the specimen was received. To the right of that box is another box labeled "Primary Specimen Bottle Seal Intact." That box has two check boxes marked "Yes" and "No, Enter Remark to Right." The signature box and the box in which the laboratory was

(Continued…)

24

"impress[ive]" level of "quality assurance" surrounding the collection and analysis of Blanks's urine sample. Kodama's testimony established that, although samples are handled by numerous divisions at Phamatech, the barcode identifiers ensure that the samples cannot be confused. Because the testing itself is automated and Kodama had reviewed the data pulled from the machine that tested Blanks's urine, his testimony that the test results accurately reflected that there was marijuana present in Blanks's urine was sufficient to show that those test results were reliable. The reliability of the test results also was bolstered because its source was a laboratory certified by the MDHMH-OHCQ to perform urinalysis testing for P&P. *See Bailey*, 327 Md. at 703.

Kodama's testimony also laid an adequate foundation for the admission of Exhibit 2 as a business record under Rule 5-803(b)(6). *See Dep't of Public Safety and Corr. Servs. v. Cole*, 342 Md. 12, 29 (1996) (proponent of record must establish through testimony that record was made at or near time of act, that it was made by person with

---

(…continued)
to indicate whether the specimen's tamper proof seal was intact both are blank on the chain of custody form.

Blanks did not argue below that the chain of custody form was incomplete and that that cast doubt on whether the seal on the specimen container was intact when the specimen was received by Phamatech and, by extension, whether the lab results reported on Exhibit 2 were reliable. Having failed to raise this issue in the circuit court, he has waived it for appeal.

Even if the issue were not waived, it lacks merit. The chain of custody form introduced into evidence by the State is a carbon copy. Its footer states: "COPY 2 – COLLECTOR COPY – YELLOW." The area to the right and left of the footer are yellow. This is plainly the copy of the chain of custody form retained at the P&P Office, not the copy that would have been sent to Phamatech for it to supplement and retain for its records.

knowledge or from information transmitted by person with knowledge, that it was made in and kept in course of regularly conducted business activity, and that it is regular practice of business to make and keep records). The record was made within three days of the tests being performed. Kodama, as director of the laboratory and the person who reviewed the positive test result data from the analyzer machines, was "a person with knowledge." He testified that Phamatech analyzed about 4,000 urine samples each day under contracts with P&P, the Maryland Department of Transportation, and other governmental and non-governmental clients, and that it prepared reports reflecting those test results. On these bases, Exhibit 2 was admissible without any additional showing of good cause. *See Bailey*, 327 Md. at 699 (if evidence is admissible under a firmly rooted exception to the hearsay rule or "has substantial guarantees of trustworthiness, the hearsay is admissible without the need to establish any additional good cause").

In any event, the court also implicitly found good cause to dispense with live testimony from a lab technician who directly handled Blanks's sample. It opined, in response to defense counsel's argument that other Phamatech employees had "inputted into the system" information about Blanks's urine sample, that it would be "highly impractical" to require the State to present live testimony from every person who touched Blanks's sample.[15] The court did not abuse its discretion in so finding. Blanks did not

---

[15] Other courts have held that urinalysis test results are admissible in probation revocation proceedings without any live testimony from a laboratory employee. *See United States v. Minnitt*, 617 F.3d 327 (5th Cir. 2010) (urinalysis report showing that probationer's urine tested positive for cocaine and marijuana properly admitted without live testimony from lab technicians upon a finding of good cause); *United States v.*

(Continued…)

26

have a significant interest in confronting a lab technician who extracted a small sample of his urine from the specimen container and deposited it into a barcoded test tube or a technician who placed that test tube in an analyzer machine, and the State had a substantial countervailing interest in not transporting multiple lab technicians from San Diego to Maryland to testify about such "a routine business event," given the volume of samples involved. *Bailey*, 327 Md. at 706.

To be sure, Kodama did not personally handle Blanks's urine sample. Nevertheless, he was the scientist who reviewed the print-out results of the two marijuana screening tests conducted on the sample, and he was able to confirm that the positive test result was accurate. He also could have been confronted (but was not) about the screening levels for the various tests and whether, for example, a false positive could result if a donor had ingested other substances. There was good cause apparent from the record to dispense with any additional live testimony.

Cannon's and Kodama's testimony, coupled with the test results documented in Exhibit 2, amply supported the circuit court's finding that, more likely than not, Blanks

---

(…continued)

*McCormick*, 54 F.3d 214 (5th Cir. 1995) (urinalysis report showing that probationer's urine tested positive amphetamines and methamphetamines was admissible without testimony from the lab technicians); *Holmes v. State*, 923 N.E.2d 479 (Ind. App. 2010) (accord). In these cases, the courts reasoned that even when a urinalysis test result is the central evidence relied upon to find a violation of probation, the probationer's interest in confronting the laboratory technicians is minimal because "the truth of a [scientific] fact can best be 'verified through the methods of science,' rather than 'through the rigors of cross examination.'" *Minnitt*, 617 F.3d at 333 (quoting *McCormick*, 54 F.3d at 222).

27

had used marijuana in violation of his probation. For all these reasons, the court did not err in finding that Blanks violated conditions 8 and 16 of his probation.

## II.

### Failure to Report

Blanks contends the circuit court erred by finding him in violation of his probation for failure to report. He maintains that even if there was sufficient evidence to support a finding that he was directed to report to the P&P Office by the close of business on February 12, 2015, and that he failed to do so, there was no evidence that his failure to report was willful.

The State responds that it was Blanks's burden to prove that his failure to report to the P&P Office by the close of business on February 12, 2015, was not willful, and he failed to meet that burden.

On direct examination in the State's case, Knapp testified, mistakenly, that he spoke to Blanks by phone on Tuesday, February 10, 2015, and directed him to come in to the P&P Office that same day. He also testified that Blanks already was scheduled to report that day. On cross-examination, defense counsel showed Knapp a copy of the calendar he had prepared for Blanks showing his reporting schedule. That calendar reflects that Blanks was not scheduled to report to the P&P Office at any time during the week of February 9, 2015. It shows that Knapp was scheduled to conduct a home visit on Friday, February 13, 2015. Knapp acknowledged, based upon the calendar, that he had been mistaken when he testified that Blanks was scheduled to come in to the P&P Office on February 10, 2015.

28

At the close of the State's case, defense counsel moved to dismiss the charge for violation of probation for failure to report based upon Knapp's testimony that "Blanks wasn't actually required to report." The State opposed the motion, arguing that, even if Blanks wasn't previously scheduled to report, Knapp had testified that he had directed Blanks to report that day. The court denied the motion to dismiss.

Blanks recalled Knapp in his case. Defense counsel showed him his supplemental statement of charges, in which he had stated that he spoke to Blanks on Wednesday, February 11, 2015, not Tuesday, February 10, 2015. Knapp acknowledged that he had been mistaken about the date in his testimony on direct examination. He testified that it was on Wednesday, February 11, 2015, that he directed Blanks to come in that day or the next day. Blanks did not tell Knapp during their phone conversation that he would be unable to report.

Knapp did not conduct the scheduled home visit on Friday, February 13, 2015. The following Monday, February 16, 2015, was President's Day and the P&P Office was closed. On Tuesday, February, 17, 2015, the P&P Office was closed because of a snow storm. Blanks turned himself in at the P&P Office on Wednesday, February 18, 2015.

As the Court of Appeals has explained:

> Generally, before probation may be revoked the State must prove that the probationer has not complied with one or more lawful conditions of probation. Even then, ordinarily probation may not be revoked *if the probationer proves* that his failure to comply was not willful but rather resulted from factors beyond his control and through no fault of his own. Of course, *if the probationer fails to carry this burden, the question whether to revoke probation is a matter within the discretion of the trial-court*.

29

*Humphrey v. State*, 290 Md. 164, 167-68 (1981) (citations omitted). *See also Bailey v. State*, 327 Md. at 695 (the State carries the initial burden of proof to show a violation of a condition of probation by a preponderance of the evidence, and if that burden is met the burden of persuasion then shifts to the probationer to prove that the violation was not willful).

In the instant case, the State carried its burden. Knapp testified that he spoke to Blanks by telephone on Wednesday, February 11, 2015, and directed him to report to the P&P Office either later that day or the next day (Thursday, February 12). He testified that he advised Blanks that it would be a violation of his probation not to report as directed. Blanks did not report as directed.

Blanks did not present any evidence that he was unable, due to forces beyond his control, to report to the P&P Office on February 11 or 12, 2015. Blanks plainly failed to meet his burden to show that his failure to report was not willful, and the court did not err or abuse its discretion in finding that Blanks violated the condition of his probation requiring him to report as directed.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**